**BANCO PARA EL COMERCIO EXTERIOR DE CUBA, Plaintiff-Appellant,**

v.

**FIRST NATIONAL CITY BANK, Defendant-Appellee.**

**No. 106, Docket 80–7297.**

United States Court of Appeals, Second Circuit.

Argued Jan. 26, 1981.

Decided Aug. 4, 1981.

**914**

Victor Rabinowitz, New York City (Michael Krinsky, Judith Levin, Rabinowitz, Boudin, Standard, Krinsky, & Lieberman, New York City, on the brief), for plaintiff-appellant.

Henry Harfield, New York City (Herman E. Compter, Charles B. Manuel, Jr., Cary M. Kittle, Shearman & Sterling, New York City, on the brief), for defendant-appellee.

Before LUMBARD, VAN GRAAFEILAND, and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

This appeal is one of six decided today [1] arising from the revolution in the Republic of Cuba in the late 1950's and the ensuing expropriation of properties owned by American companies. In this action, plaintiff-appellant Banco Para el Comercio Exterior de Cuba ("Bancec") brought suit against defendant First National City Bank ("Citibank") to recover $193,280 on an unpaid letter of credit.[2] Citibank counterclaimed, seeking dismissal of the complaint on the ground that Citibank's losses resulting from the expropriation of its assets by the Cuban government exceeded the amount of Bancec's claim. The United States District Court for the Southern District of New York, Charles L. Brieant, Jr., *Judge*, ruled, in a decision reported at 505 F.Supp. 412, that Citibank's counterclaim was justiciable and could properly be asserted against Bancec, and that the value of Citibank's counterclaim exceeded the value of Bancec's claim. Accordingly the district court dismissed the complaint on its merits. Bancec has appealed, challenging the district court's decision in a number of respects. Since we find merit in the argument that Citibank's counterclaims could not properly be asserted against Bancec, we reverse and

---

1. The other five are *Banco Nacional de Cuba v. Chase Manhattan Bank*, No. 80–7375, 658 F.2d 875 (2nd Cir.); *First Bank of Boston (International) v. Banco Nacional de Cuba*, No. 80–7299, 658 F.2d 895 (2nd Cir.); *Banco Nacional de Cuba v. Chemical Bank New York Trust Co.*, No. 80–7209; *Banco Nacional de Cuba v. Irving Trust Co.*, No. 80–7205; and *Banco Nacional de Cuba v. Manufacturers Trust Co.*, No. 80–7215. The last three cases were consolidated for ar-

gument and were decided in a single opinion, 658 F.2d 903 (2nd Cir.).

2. Bancec's original claim as stated in its complaint was for $217,249. The parties have agreed that, after a deduction of $23,969 for expenses that had been authorized by Banco Nacional as agent for Bancec, the net debt was $193,280.30.

remand for entry of an appropriate judgment in favor of Bancec in the amount of $193,280.

## BACKGROUND

The events surrounding the Cuban revolution of the late 1950's have been reviewed by this Court, as well as others, on several occasions. We assume familiarity with the historical discussion in the cases set out in the margin,[3] as well as that in our decision today in *Banco Nacional de Cuba v. Chase Manhattan Bank*, No. 80–7375, 658 F.2d 875 (2nd Cir.) (*"Chase"*).

### A. *Bancec and Its Claim*

Bancec was organized under the laws of the Republic of Cuba by virtue of Law No. 793 of April 25, 1960, as the successor to Banco Cubano del Comercio Exterior which had been created in 1954. Law No. 793 established Bancec as "[a]n official autonomous credit institution for foreign trade . . . with full juridical capacity and capital of its own." The bank was capitalized at 6,000,000 pesos ($6,000,000), subscribed and paid for by the Republic, which transferred capital that it owned in Banco Cubana del Comercio Exterior ($3,500,000) and in Banco de Desarrollo Económico y Social ($2,500,000), the former bank for social and economic development. Its purposes included the encouragement of production of goods for export, the increase of exports without affecting essential national sources of supply, and the stimulation and diversification of foreign markets for Cuban products. In order to fulfill these objectives, Bancec was empowered, *inter alia*, "[t]o buy in the country and sell abroad all kinds of national agricultural, industrial or mining products . . . [and] to finance and grant loans and advances to national concerns or organizations that produce or may produce for for-

eign markets," and "to engage in all manner of active banking operations." Law No. 793, Bylaws IX(b), (f). Bancec was to be run by a Governing Board and a General Manager to be appointed by the Board. The Governing Board consisted of delegates from the Ministries of Commerce and Economy, the Department of Mines and Petroleum of the Ministry of Agriculture, and the National Agrarian Reform Institute ("INRA"). Although Bancec was required to deposit its profits with the treasury of the Republic semi-annually, the Governing Board was empowered to deduct from fiscal revenues such amounts as were deemed "essential for the proper operation" of the bank.

On August 12, 1960, Bancec entered into two written agreements relevant to its present claim. It agreed to purchase a quantity of sugar from INRA, and to sell that sugar to the Cuban Canadian Sugar Company. The contract between Bancec and Cuban Canadian Sugar was supported by an irrevocable letter of credit in favor of Bancec issued by Citibank on August 18, 1960, which Bancec assigned, for collection, to Banco Nacional de Cuba ("Banco Nacional"), the central bank of Cuba which is described in greater detail in part B, *infra*. After a series of events not here material, Citibank was called on to pay $193,280 to Banco Nacional as Bancec's agent on the letter of credit on September 21, 1960. Citibank, whose Cuban branches had been expropriated by the Cuban government just days before, credited that amount to the account of Banco Nacional, but refused to pay it to Banco Nacional and instead applied it against the amount lost in the expropriation.

On February 1, 1961, Bancec brought this action against Citibank to recover the $193,-

---

**3.** *See, e. g., Banco Nacional de Cuba v. First National City Bank*, 270 F.Supp. 1004 (S.D.N.Y. 1967), *rev'd*, 431 F.2d 394 (2d Cir. 1970), *vacated and remanded*, 400 U.S. 1019, 91 S.Ct. 581, 27 L.Ed.2d 630 (1971), *on remand*, 442 F.2d 530 (2d Cir. 1971), *rev'd*, 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972), *on remand*, 478 F.2d 191 (2d Cir. 1973); *Banco Nacional de*

*Cuba v. Sabbatino*, 193 F.Supp. 375 (S.D.N.Y. 1961), *aff'd*, 307 F.Supp. 845 (2d Cir. 1962), *rev'd*, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804, *on remand, sub nom. Banco Nacional de Cuba v. Farr*, 243 F.Supp. 957 and 272 F.Supp. 836 (S.D.N.Y.1965), *aff'd*, 383 F.2d 166 (2d Cir. 1967), *cert. denied*, 390 U.S. 956, 88 S.Ct. 1038, 20 L.Ed.2d 1151 (1968).

280.[4] Citibank does not appear to dispute here the validity of Bancec's claim.

## B. *The Expropriation*

As set forth in greater detail in our opinion today in *Chase*, following the installation of the revolutionary Cuban government on January 1, 1959, relations between Cuba and the United States deteriorated seriously. On July 6, 1960, Cuba enacted Law No. 851 which, inter alia, authorized the President and Prime Minister of the Republic, "acting jointly through appropriate resolutions . . . [to] proceed to nationalize, through forced expropriation, the properties or enterprises owned by physical and corporate persons who are nationals of the United States of North America . . . ."[5] Under this law Cuba nationalized numerous American-owned corporations, branches, and businesses. On September 16, 1960, under an executive order denominated "Resolution No. 2," pursuant to Law No. 851, the Cuban government expropriated and nationalized the eleven Cuban branches of Citibank.[6] Resolution No. 2 designated Banco Nacional as the instrumentality to take over these assets.

Banco Nacional, since its formation in 1948, had functioned as the central Bank of Cuba. It engaged in domestic and international banking and was the sole depository of state funds. In addition it had extensive powers both to control and protect the Cuban currency in international trade and to regulate all commercial banks operating in Cuba. Following the revolution, Banco Nacional was placed in control of the assets and businesses of all nationalized private banks.

## C. *Citibank's Counterclaims*

Citibank counterclaimed against Bancec for losses resulting from the expropriation of its branches by the Cuban government, contending that Bancec was indistinguishable from the Cuban government. Alleging that its losses far exceeded the amount of Bancec's claim, Citibank sought dismissal of the complaint. It did not seek an affirmative award of damages.

## D. *Decision of the District Court*

A bench trial was held before the late Judge Frederick van Pelt Bryan who died before being able to render a decision. Thereafter the case, along with several companion cases, was reassigned to Judge Brieant who, upon consent of the parties, rendered a decision on the basis of the record made before Judge Bryan. Judge Brieant held that Citibank's counterclaim was justiciable and was properly asserted against Bancec. Because he found that the value of Citibank's losses far exceeded the value of Bancec's claim, judgment was entered dismissing Bancec's complaint on the merits.

---

**4.** Thereafter Bancec was dissolved by the operation of two statutes dated February 23, 1961, Laws Nos. 930 and 934. Under Law No. 930, the rights, claims and assets of Bancec that were "peculiar to the banking business" were assigned to Banco Nacional; under Law No. 934, the assets and claims of Bancec that were not peculiar to the banking business, including the claim asserted in the present action, were assigned to the government's newly created Ministry of Foreign Trade, which was to establish state trading corporations for the conduct of international trade, and for whose obligations the Ministry was not to be liable. Pursuant to Law No. 934, Empresa Cubana de Exportaciones was created to conduct all commercial activity previously conducted by Bancec, and, upon its dissolution on December 31, 1961, that corporation was succeeded by the still extant Empresa Cubana Exportadora de Azucary sus

Derivados (Cuban Enterprise for Export of Sugar and its Derivatives), with respect to the rights of Bancec relating to foreign commerce in sugar and its derivatives.

**5.** The translations of Law No. 851 provided by the parties in *Chase, supra,* and *First National Bank of Boston (International) v. Banco Nacional de Cuba, supra* note 1, respectively, differ somewhat from that provided in the present case, as well as from each other.

**6.** The Cuban branches of Chase Manhattan Bank and First National Bank of Boston were nationalized pursuant to the same Resolution. All other private banking interests, other than Canadian, were nationalized pursuant to Law No. 891 on October 13, 1960. Canadian banks were nationalized later.

On appeal, Bancec attacks the judgment of the district court in several respects. It contends, inter alia, that Bancec is not an alter ego of the Cuban government for purposes of Citibank's counterclaims, that the counterclaim, even if asserted against the proper party, is nonjusticiable under the act of state doctrine, and that Citibank's losses from the expropriations have been compensated by setoffs in prior litigation. Since we agree that the counterclaim for expropriation of the branches was not assertable against Bancec, we reverse on that ground.

## DISCUSSION

Bancec's contention that Citibank's counterclaim may not be asserted against it is based on the premise that the expropriations were carried out by the Cuban government without participation by Bancec, and that Bancec was a distinct juridical entity in its own right, separate and apart from the Cuban government. It argues that the counterclaim must therefore be asserted against the Cuban government, and not against Bancec.

The district court rejected this proposition for a variety of reasons. First, it noted that all of Bancec's capital had been contributed by the Cuban government, and that Bancec had no function except to manage the export of commodities for the account of the government. Thus, it was a creature of the Cuban government, engaged in a state function. 505 F.Supp. at 425. The court stated that it saw no legal or factual basis for distinguishing between Bancec and Banco Nacional insofar as the identity of either with the Cuban government was concerned, 505 F.Supp. at 427, and found Bancec to be an alter ego of the Cuban government to the same extent and "for essentially the same reasons" as Banco Nacional was such an alter ego, *id.* at 423; in ruling that Banco Nacional was an alter ego of the Cuban government,[7] the district court relied on our opinion in *Banco Nacional v. First National City Bank,* 478 F.2d 191, 193–94 (2d Cir. 1973), as dispositive. 505 F.Supp. at 429–30. Finally, apparently recognizing that Law No. 793 had created Bancec as a separate juridical entity, the court stated that since the equities were so strongly in favor of Citibank, it would recognize the practicalities of the situation: "Doing justice in this case should not be obfuscated or side-tracked by self-serving recitals in post-revolutionary statutes of the Cuban Government, undoubtedly drawn with litigation of this sort in mind. The Court concludes that Bancec is an *alter ego* of the Cuban Government."[8] 505 F.Supp. at 428.

While we agree with the district court's descriptions of Bancec's functions and its status as a wholly-owned instrumentality of the Cuban government, we reject its conclusions. Our 1973 ruling that Banco Nacional was the alter ego of the Cuban government for purposes of the counterclaims by Citibank against Banco Nacional had a precise basis that does not exist with respect to Bancec, and we conclude that Bancec was not an alter ego of the Cuban government for the purpose of the present counterclaims.

7. This ruling was made in the *Chase* suit; Judge Brieant rendered his decisions in both the present case and *Chase* in a single opinion.

8. The court properly rejected Citibank's alternative theory for recovery in the event Bancec was not held to be an alter ego of the Republic of Cuba. This theory argued that the real party in interest here is Banco Nacional and not Bancec, because it was Banco Nacional that held the letter of credit as agent for collection. Under this view of the letter of credit transaction, Bancec would stand as a beneficiary of Citibank's promise to pay Banco Nacional and its rights would be subject to Citibank's setoff against Banco Nacional. Judge Brieant correctly ruled that Citibank, dealing as it was with an agent for a disclosed principal cannot set off Banco Nacional's indebtedness against the amount it owed to Bancec. *See Fuller v. Fasig-Tipton Co.,* 587 F.2d 103, 106 (2d Cir. 1978). Even if Citibank did not have actual knowledge of the agency relationship—although it would seem unlikely that it did not— it was on notice, given the statutory presumption accompanying negotiable instruments deposited or received for collection. *See* N.Y. Negotiable Instruments Law § 350–a (repealed effective Sept. 27, 1964 as to transactions occurring after that date). *See* 505 F.Supp. at 425–27.

■ As a general matter, we start with the proposition that an instrumentality of a government is not necessarily an alter ego of that government for all purposes. If the instrumentality has been created as a separate and distinct juridical entity under the laws of the state that owns it, we will normally respect its independent identity for a number of purposes. For example, we will not generally hold that the presence of the instrumentality in the United States is sufficient to give a United States court jurisdiction over the government of the state that created it. *See, e. g., National American Corp. v. Federal Republic of Nigeria,* 448 F.Supp. 622, 637 n.26 (S.D.N.Y. 1978), *aff'd on other grounds,* 597 F.2d 314 (2d Cir. 1979). And we will recognize that two distinct entities exist sufficient that an agreement of agency could be formed between them. *See, e. g., East Europe Domestic International Sales Corp. v. Terra,* 467 F.Supp. 383, 387–88 (S.D.N.Y.), *aff'd,* 610 F.2d 806 (2d Cir. 1979).

■ We will, on the other hand, ignore the statutory distinction between the state and its instrumentality when the subject matter of the counterclaim assertible against the state is state conduct in which the instrumentality had a key role. This was the basis of our affirmance in *Banco Nacional v. First National City Bank, supra.* Thus, our opinion described the expropriation of Citibank's branches, and Banco Nacional's role in it, as follows:

> On Friday, September 16, 1960, the takeover of National City Bank's assets in Cuba began. Late in the day, the vice-president of National City Bank in charge of Cuban operations, Juan D. Sanchez, began to receive telephone calls from the officers in charge of the branches of National City Bank in Cuba indicating that the Cuban militia were demanding the keys to the National City Bank's properties. At 11:00 P.M. on the 16th, Sanchez contacted one Bustabad, a member of the militia and a delegate of the bank employee's [*sic*] union. Bustabad stated that the militia had received orders *from Banco Nacional de Cuba* to occupy all of National City Bank's branches.

> On the night of the 16th all of National City Bank's branches were occupied by the Cuban militia acting on orders from officials of Banco Nacional.

> On Monday, September 19th, Sanchez, at the instructions of Cuban officials, appeared at the main office of National City Bank in Havana. Here he found armed men patrolling the bank, men who were members of the bank employee's [*sic*] branch of the militia. Sanchez was officially informed of the nationalization and told that Banco Nacional officials were taking over the operation of the bank. The official order nationalizing the bank was signed by Che Guevara, Minister of State, as President of Banco Nacional.

*Id.* at 193–94 (emphasis in original). We concluded that Banco Nacional and the government of Cuba had acted as alter egos in the expropriation and hence were to be so regarded with respect to the counterclaim in that lawsuit.

Our ruling in the *Banco Nacional* case was carefully limited to the circumstances in which the counterclaim was based on the acts of expropriation that were performed principally by the instrumentality that was a party. Thus, we reiterated that Banco Nacional and the Cuban government were alter egos "in the nationalization," *id.* at 193, "in the expropriation," *id.* at 194, "in implementing the nationalization policy," *id.*; and we stated that our conclusion was reached "for the purposes of this litigation." *Id.* at 193; *id.* n.1. We ended this section of our opinion by emphasizing that the issue was not whether Banco Nacional and the government could be considered alter egos in general; the "decisive" fact was the role of Banco Nacional in the expropriations that were the subject of the Citibank counterclaims:

> Appellant urges that Banco Nacional was an independent juridical entity, an "autonomous organization" free from the control of the Cuban government. However, we are not concerned with any theo-

retical overall relationship between the bank and the Cuban government. The decisive facts here are those which show the function of Banco Nacional in the expropriation of National City Bank's property in Cuba. Those facts clearly indicated Banco's active role as a mere arm or division of the Cuban government. *Id.* at 194.

▇ The circumstances with respect to Bancec are materially different. Although Bancec was an instrumentality of the Cuban government, it was principally. engaged in promoting foreign trade. It was this engagement that gave rise to the claim it asserts in the present lawsuit. The claim is a purely commercial one having no connection with the revolution or the expropriations—except that the expropriation led Citibank to refuse payment. And Citibank has not shown that Bancec played any role whatever in the expropriations of the Citibank branches. Since Bancec had no connection with the subject matter of the Citibank counterclaims, we will not rule, for the purposes of the present litigation, that Bancec was an alter ego of the Cuban government.

▇ The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602–11 (1976), assuming it may be applied retroactively to affect this action,[9] does not require a different result. That Act was intended to clarify that foreign states are not immune from the jurisdiction of the United States courts for acts done in the course of their commercial activities in the United States. Despite the fact that § 1603 of the Act defines a state to include its instrumentalities, and § 1607(c) provides that a foreign state as plaintiff is not immune from an offsetting counterclaim, other sections of the Act show that differences between a state and its instrumentalities are intended to be recognized. Section 1610, for example, treats states and their instrumentalities differently: it subjects all of the property of an instrumentality to execution upon a judg-

ment on a claim against it, whether or not the property had any connection with the claim, § 1610(b); but it subjects the property of a state itself to execution only if the property "is or was used for the commercial activity upon which the claim was based", § 1610(a)(2). Thus, it appears that by including a state's instrumentalities within the definition of a state, Congress intended to make instrumentalities amenable to suit on account of any commercial activity they conduct within the United States; but it does not appear that Congress intended to subject an instrumentality to liability for acts or transactions with which it had no connection, which were done or entered into by other agencies or instrumentalities of the state.

This reading of the FSIA is supported by the legislative history of the Act, which is rich in disclaimers of any intention to cause the courts willy-nilly to pierce the corporate veils of foreign entities such as trading corporations. Thus, the House of Representatives Committee report on the FSIA bill stated that the "bill is not intended to affect the substantive law of liability. Nor is it intended to affect ... the attribution of responsibility between or among entities of a foreign state; for example, whether the proper entity of a foreign state has been sued, or whether an entity sued is liable in whole or in part for the claimed wrong." H.R.Rep.No.94–1487, 94th Cong., 2d Sess. 12 (1976), *reprinted in* [1976] *U.S. Code Cong. & Ad.News* 6604, 6610. Similarly, with respect to § 1610, the Report stated as follows:

> Section 1610(b) will not permit execution against the property of one agency or instrumentality to satisfy a judgment against another, unrelated agency or instrumentality. See *Prelude Corp. v. Owners of F/V Atlantic*, 1971 A.M.C. 2651 (N.D.Calif.). There are compelling reasons for this. If U.S. law did not respect the separate juridical identities of different agencies or instrumentalities, it

---

**9.** The FSIA, which became effective on January 21, 1977, sixteen years after the commencement of this action, states that "henceforth"

claims of foreign states to immunity should be decided under the principles set forth in the Act. 28 U.S.C. § 1602.

might encourage foreign jurisdictions to disregard the juridical divisions between different U.S. corporations or between a U.S. corporation and its independent subsidiary. However, a court might find that property held by one agency is really the property of another.

*Id.* at 6628–29 (citations omitted). Consistent with these disclaimers, the Report stated that § 1607(c), the counterclaim section, was intended simply to codify the rule in *National City Bank v. Republic of China*, 348 U.S. 356, 75 S.Ct. 423, 99 L.Ed. 389 (1955). That case established that a foreign sovereign was not immune from a counterclaim not exceeding the value of the sovereign's claim; it said nothing about asserting such counterclaims where the state was absent and suit had been brought by an instrumentality in its own right.

In short, we decline to hold that a trading corporation wholly owned by a foreign government, but created and operating as a separate juridical entity, is an alter ego of that government for the purpose of recovery for wrongs of the government totally unrelated to the operations, conduct, or authority of the instrumentality.

### CONCLUSION

We reverse the judgment of the district court and remand for dismissal of Citibank's counterclaims and for such further proceedings as may be necessary. If, as appears, Citibank does not contest the validity of Bancec's claim, judgment should be entered for Bancec in the amount of $193,-280.30 together with such prejudgment interest as may be appropriate. The judgment should order that payment be made in accordance with the Cuban Asset Control Regulations, 31 C.F.R. Part 515 (1980); *see* 22 U.S.C. §§ 1643–43k (1976), to await such disbursement as may be permitted by appropriate federal authorities.