**UNITED STATES of America, Appellee,**

**v.**

**James EDGAR, Appellant.**

**No. 91–2480NE.**

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 14, 1992.

Decided July 9, 1992.

---

James Edgar, Lincoln, Neb., argued (Patrick T. O'Brien, on the brief), for appellant.

Counsel who presented argument on behalf of the appellee was Steven Arthur Russell, Lincoln, Neb., argued (Ronald D. Lahners and Steven A. Russel, argued on the brief), for appellee.

Before RICHARD S. ARNOLD, Chief Judge, HEANEY, Senior Circuit Judge, and MAGILL, Circuit Judge.

MAGILL, Circuit Judge.

James M. Edgar appeals the sentence imposed by the district court after a jury found him guilty of bankruptcy fraud and conspiracy to commit bankruptcy fraud. We reverse and remand.

## I.

Edgar's conviction for bankruptcy fraud stemmed from his legal representation of Peter Salter. Salter was the owner of Duplitech Corporation, a copying and printing business. Although Duplitech had filed for Chapter 11 bankruptcy protection in 1983, the bankruptcy was still pending in early 1987 when Dan Fuss approached Salter about the possibility of purchasing his busi-ness. Edgar, acting as Salter's attorney, handled the successful negotiations for this sale and drew up many of the documents. The final purchase agreement provided that Salter would receive a total of $35,000 up front and a specified percentage of gross receipts over a period of twenty years. This agreement also contained a clause stating that Fuss would pay off or compromise the bankruptcy claims against Duplitech "as the BUYER shall determine in the buyer's sole discretion." Pl.'s Ex. 19. In addition to the purchase agreement, Salter and Fuss entered an employment agreement in which Fuss agreed to employ Salter for a period of seven years with a specified monthly salary that included use of a car. Despite the fact that the assets of Duplitech formally belonged to the bankruptcy estate, neither Edgar nor Salter informed the bankruptcy court of their sale to Fuss. In fact, Edgar structured the sale so that the assets of Duplitech and the proceeds from their sale would be difficult to trace. Salter did not use any of the proceeds he received up front to pay Duplitech creditors.

Approximately seven months after completion of the sale, the bankruptcy court was informed that Salter had sold all of Duplitech's assets to Fuss. In response, the court appointed a trustee to investigate the sale and attempt to recover for the estate either the assets transferred or the value of those assets. The trustee's investigation led to his filing of a civil suit against, *inter alia,* Edgar and Fuss. Edgar settled his suit for $5000. Fuss, from whom the trustee was attempting to recover either the assets of Duplitech or the value of those assets, settled for $300,000. This settlement amount was based on the present value of the payments Salter was to receive under the purchase agreement and the employment agreement.

The bankruptcy court also informed the FBI of the sale. The FBI's investigation led to the indictment of Edgar for bankruptcy fraud and conspiracy to commit bankruptcy fraud, in violation of 18 U.S.C.

§§ 152 and 371 (1988).[1] Although Edgar admitted the acts he had taken in connection with the sale of Duplitech's assets, he denied any intent to defraud creditors or to conceal assets of the bankruptcy estate. After a three-week trial, a jury found him guilty on all counts—rejecting Edgar's defense of lack of the requisite criminal intent. Following a sentencing hearing,[2] the district court concluded that Edgar's offense level was seventeen, based on a base offense level of six, a seven-level increase for a loss of more than $120,000 but less than $200,000, a two-level increase for violation of the bankruptcy process, and a two-level increase for more than minimal planning. The court denied Edgar's request for a two-level reduction for acceptance of responsibility. With a criminal history category of I, this resulted in a sentencing range of twenty-four to thirty months. The court denied Edgar's request for a downward departure from this range, and sentenced Edgar to twenty-four months incarceration, three years supervised release, and $25,000 restitution.

Edgar now appeals his sentence. He claims that the district court erred in denying a two-level reduction for acceptance of responsibility, in denying a downward departure from the sentencing range, and in calculating the loss caused by his fraud. We discuss each of his claims in turn.

## II.

### A. Acceptance of Responsibility

■ The Sentencing Guidelines provide that the court may reduce the defendant's offense level by two "[i]f the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct." U.S.S.G. § 3E1.1(a). We give great deference to the district court "when reviewing its evaluation of a defendant's acceptance

of responsibility, and will disturb the district court's decision only if it is without foundation." *United States v. Russell*, 913 F.2d 1288, 1295 (8th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1687, 114 L.Ed.2d 81 (1991).

Prior to being found guilty by a jury, Edgar denied any intent to defraud the creditors. Only after the jury returned its verdict of guilty did Edgar voluntarily relinquish his license to practice law and state that he accepted the jury's verdict of guilty and thought that it was correct. The district court did not clearly err in denying the reduction based on Edgar's refusal to admit an essential element of bankruptcy fraud before his conviction. U.S.S.G. § 3E1.1, comment. (n. 2); *see also, e.g., United States v. Stuart*, 923 F.2d 607, 613 (8th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 1599, 113 L.Ed.2d 662 (1991) (no acceptance of responsibility reduction when defendant put the government to its burden of proof at trial by denying any intent to distribute a controlled substance); *United States v. Sloman*, 909 F.2d 176, 182 (6th Cir.1990) (no acceptance of responsibility reduction when defendant gave statements to officers and expressed regret over what happened, but never admitted any fraudulent intent).

### B. Downward Departure

■ The Sentencing Guidelines allow a court to depart downward from the applicable sentencing range if the court finds " 'that there exists [a] ... mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines....' " U.S.S.G. § 5K2.0, p.s. The district court's ruling that it could depart from the sentencing range only if it found that such a mitigating circumstance existed was a correct interpretation of the guidelines.[3] *See United States v. John-*

---

1. Salter also was indicted and found guilty of bankruptcy fraud and conspiracy to commit bankruptcy fraud.

2. At this hearing, the district court heard testimony on both acceptance of responsibility and the amount of loss.

3. The court also correctly noted that a departure for substantial assistance was not available because the government had not made a motion for departure. U.S.S.G. § 5K1.1, p.s.; *see also United States v. Kelley*, 956 F.2d 748, 757 (8th Cir.1992).

*son,* 908 F.2d 396, 399 (8th Cir.1990). The district court's conclusion that no such mitigating circumstance existed in this case, and thus it did not have a basis for departure, was an exercise of discretion that is not reviewable. *See, e.g., United States v. Evidente,* 894 F.2d 1000, 1004 (8th Cir.), *cert. denied,* 495 U.S. 922, 110 S.Ct. 1956, 109 L.Ed.2d 318 (1990).

### C. Amount of Loss

■ Under the Sentencing Guidelines, the offense level for fraudulent conduct is increased according to the amount of loss. The amount of loss used to increase the offense level may be either the amount of loss the defendant intended to inflict or the actual loss resulting from the fraudulent conduct, whichever is greater.[4] U.S.S.G. § 2F1.1, comment. (n. 7); *see also, e.g., United States v. Smith,* 951 F.2d 1164, 1166 (10th Cir.1991). In this case, the district court found that the intended loss was the value of Duplitech as a going concern. The court further concluded that the only reliable evidence of Duplitech's value was the $300,000 settlement between Fuss and the bankruptcy trustee, and the present value of the payments Salter was to receive under the purchase agreement and the employment agreement. An accountant calcu-

lated that the present value of these payments was about $270,000.[5] Based on this evidence, the court estimated that Duplitech's value was in the range of $270,000 to $300,000. The court then subtracted $100,000 from this amount because the court found that Edgar intended Fuss to pay the bankruptcy creditors approximately $100,000. Sentencing Tr. at 17–18 (held June 17, 1991). These calculations resulted in an intended loss of approximately $170,000 to $200,000. Because this amount exceeded the actual loss of approximately $75,000, the court concluded that the appropriate loss range was $120,000 to $200,000, resulting in a seven-level increase. U.S.S.G. § 2F1.1(b)(1)(H).

■ As the above facts make clear, the calculation of loss in a bankruptcy fraud case can be rather complicated. It is thus not surprising that the district court made both some correct and some incorrect assumptions in calculating the loss. The district court correctly used the greater of the intended loss and the actual loss to calculate the offense level increase. The court also did not err in using the going-concern value of Duplitech rather than its liquidation value in calculating the value of the concealed assets. There was no proof that

---

**4.** At the time Edgar was sentenced in 1991, the Sentencing Guidelines specifically provided that "if a probable or intended loss that the defendant was attempting to inflict can be determined, that figure would be used if it was larger than the actual loss." U.S.S.G. § 2F1.1, comment. (n. 7) (1990). This note was changed on November 1, 1991, to provide that "if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss." U.S.S.G. § 2F1.1, comment. (n. 7) (1991). The only difference between these two notes is the inclusion of "probable loss" in the version applicable to Edgar at the time of his original sentencing. "Probable loss" is an ambiguous term. *See United States v. Kopp,* 951 F.2d 521, 531 n. 16 (3d Cir.1991) (discussing alternative interpretations of "probable loss"). Fortunately, the district court clearly based Edgar's sentence on intended loss, and not on probable loss. App. at 60. Because we conclude that the district court incorrectly calculated intended loss, and thus are remanding this case for resentencing, it is not necessary for us to define "probable loss" here. Additionally, because the district court will apply the guidelines in effect at the time of

resentencing (including the current version of note seven), the district court also will not have to define "probable loss." 18 U.S.C. § 3553(a)(4), (5) (1988); *Kopp,* 951 F.2d at 526. Only when the retroactivity of a guidelines' change results in a harsher penalty, and thus an *ex post facto* problem arises, is the district court required to apply the earlier version. *Id.* Given that the earlier note required the district court to increase the offense level based on either probable loss, intended loss, or actual loss, whichever is larger, deletion of the phrase "probable loss" could not result in a harsher penalty. Thus, no *ex post facto* problems can arise by applying the most current version of note seven.

**5.** A present value calculation discounts a stream of future payments to that amount which, if presently received, could be invested at a given interest rate to yield the future payments. *See, e.g., DuBois v. DuBois,* 335 N.W.2d 503, 506 (Minn.1983). In this case, the accountant discounted the amount of the future payments to arrive at the present value on the date the purchase agreement and employment agreement were executed.

the creditors would have recovered only the liquidation value of Duplitech if it had not been sold to Fuss without the bankruptcy court's approval. Additionally, the court properly concluded that the present value of the amount Fuss was willing to pay for Duplitech is a valid measure of Duplitech's value. It is well established that the fair market value of a business as a going concern is "that price a willing seller could secure from a willing buyer." *Albrecht v. Herald Co.*, 452 F.2d 124, 131 (8th Cir. 1971); *see also Malley–Duff & Assocs. v. Crown Life Ins. Co.*, 734 F.2d 133, 148 (3d Cir.), *cert. denied*, 469 U.S. 1072, 105 S.Ct. 564, 83 L.Ed.2d 505 (1984); *Banco Nacional De Cuba v. Chase Manhattan Bank*, 505 F.Supp. 412, 459–60 (S.D.N.Y.1980), *rev'd on other grounds*, 658 F.2d 913 (2d Cir.1981), *rev'd*, 462 U.S. 611, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983). In this case, Fuss was a purchaser willing to buy Duplitech, and Salter was an owner willing to sell it. In fact, the amount Fuss agreed to pay for Duplitech was the most reliable evidence of Duplitech's value available to the district court. The $300,000 settlement between Fuss and the bankruptcy trustee had little, if no, independent significance in the valuation of Duplitech because it was derived from the present value of the amount Fuss agreed to pay under the purchase agreement and employment agreement.

■ Although the court correctly treated the amount Fuss paid for Duplitech as reliable evidence of Duplitech's value, the court erred when it treated the amount Salter was to receive under the employment agreement as part of the purchase price for Duplitech. The monthly salary Fuss agreed to pay Salter and the car Fuss gave Salter to drive were not compensation for the assets of Duplitech.[6] Rather, the

employment agreement between Fuss and Salter clearly provides that the monthly salary and the car were compensation for Salter's post-sale services, and that Fuss was not liable for this compensation if he terminated Salter's employment for cause. Because the valuation of Duplitech should not have included the payments Salter was to receive under the employment agreement, the only amounts relevant to Duplitech's value were the $35,000 up-front payment and the percentage of gross receipts Fuss agreed to pay Salter.[7] Based on the accountant's calculations, the present value of all these payments totalled approximately $150,000. Supp.App. at 4–5.

■ In addition to not being properly included in the valuation of Duplitech, the present value of the employment agreement cannot, in its own right, constitute a portion of the intended loss. Salter's future earnings from personal service were never part of the bankruptcy estate. *Cf.* 11 U.S.C. § 541(a)(6) (1988) (the bankruptcy estate does not include "earnings from services performed by an individual debtor after the commencement of the case"). Edgar could not have intended to deprive Duplitech creditors of an amount they were not entitled to in the first place.

■ Another error the district court made in calculating the intended loss was to deduct the $100,000 it found that Fuss was going to pay the Duplitech creditors from the amount Fuss was going to pay Salter. Fuss had agreed to pay Salter approximately $150,000 in 1987 dollars, *and* to pay the creditors approximately $100,-000. This indicates that Fuss valued Duplitech at approximately $250,000, not at the difference between these two amounts. Thus, based on the amount Fuss was willing to pay for Duplitech, Salter, with the

---

6. No expert testified that the payments Salter was to receive under the employment agreement were properly included in a valuation of Duplitech. Gregory Nielsen, the accountant hired by the bankruptcy trustee, testified on the present value of the payments Salter was to receive under the purchase agreement and the employment agreement. He did not testify that the payments due under the employment agreement reflected on the value of Duplitech. In

fact, another accountant testified that compensation for future services is not properly included in a valuation of a company. Sentencing Tr. at 130–31 (held June 11, 1991).

7. Although Salter also was to receive a 20% ownership interest in the surviving entity, there was no evidence introduced as to the value of this interest.

help of Edgar, fraudulently transferred assets worth approximately $250,000. Obviously, however, Edgar did not intend to deprive the creditors of the entire $250,000 because Fuss was to pay $100,000 of Duplitech's value to the creditors rather than to Salter. Accordingly, Edgar could not have intended to conceal from the creditors more than the $150,000 that Salter was to receive.

▮▮▮ If calculation of the intended loss stopped here, we could simply affirm Edgar's sentence, which was based on a loss range of $120,000 to $200,000. It is possible, however, for the intended loss to be less than the value of the concealed property. This situation arises when an individual debtor or the sole owner of a corporate debtor is the party who benefits from the concealment, and the value of the concealed property exceeds the amount of debt owed to the creditors.

A hypothetical can best illustrate this situation. Assume that an individual debtor has one asset, a painting worth $5000, and debt of $1000. Assume further that because her creditors are threatening to execute judgment—forcing her to sell the painting—the debtor, with the help of a third party, fraudulently conceals the painting and files for bankruptcy, depriving her creditors of $1000. After the third party who helped the debtor is found guilty of fraud, the sentencing court must determine the amount of intended loss. Because the debtor is the party who benefited from the concealment, the third party clearly intended no loss to the debtor. The only remaining entities that could be injured by the concealment are the creditors and the bankruptcy estate. The third party clearly intended to deprive the creditors of the $1000 they were owed. Additionally, because all the debtor's property goes into the bankruptcy estate, 11 U.S.C. § 541 (1988), the estate was deprived of $5000, the full value of the concealed painting. The estate, however, would not have kept this $5000 indefi-

nitely. Rather, the estate trustee would have used it to pay the creditors, and then would have returned the remaining portion, approximately $4000, to the debtor. Because this $4000 would have been returned to the same person who obtained it as a result of the fraudulent concealment, we do not believe it is appropriate to include it in the amount of intended loss. In this situation, the third party's culpability is more comparable to that of a con artist who swindles a person of $1000 than to that of a con artist who swindles a person of $5000. Cf. Smith, 951 F.2d at 1167 (noting that the relative culpability of a defendant is a relevant factor in calculating the amount of loss); United States v. Schneider, 930 F.2d 555, 559 (7th Cir.1991) (same). We thus conclude that the amount of debt places a cap on the intended loss when an individual debtor or the sole owner of a corporate debtor is the party who benefits from the concealment.

▮▮▮ Of course, the amount of debt is not fixed in Chapter 11 bankruptcies. Accordingly, the sentencing court must make a reasonable estimate of the amount of debt anticipated at the time of the fraudulent transfer. When estimating this debt, the court should include the liabilities likely to be incurred by the on-going operations of the debtor and the foreseeable costs of administering the estate. Additionally, the court should deduct from these estimated liabilities any payments that the defendant intended the creditors to receive. Although it is always possible that an intended payment will not be made, intended loss is not the same as possible or potential loss. See Kopp, 951 F.2d at 529; United States v. Hughes, 775 F.Supp. 348, 350 (E.D.Cal.1991).

▮▮▮ In this case, Salter, the owner of Duplitech,[8] was the party who benefited from the concealment—Fuss was to pay him the $150,000. Thus, it is necessary to determine whether the amount of debt was less than $150,000, the value of the con-

---

**8.** Although the record contains some ambiguous references to other shareholders of Duplitech, it appears that, at the time Duplitech's assets were transferred to Fuss, Salter was the sole owner.

The disclosure statement prepared in conjunction with the bankruptcy goes so far as to call Duplitech Salter's alter ego.

cealed property. If it is, the amount of debt is the intended loss. If it is not, the value of the concealed property, $150,000, is the intended loss. The amount of debt reasonably anticipated in September 1987, when Edgar arranged for Fuss to purchase Duplitech, is not readily apparent. At the time Duplitech filed for bankruptcy in 1983, it listed outstanding liabilities of $118,016.14. At the time Duplitech had a plan confirmed in 1990, it had outstanding liabilities of approximately $643,851.89. The amount of liabilities anticipated in 1987 must be somewhere between these two figures.[9] Additionally, because Edgar intended Fuss to pay off $100,000 of these liabilities, $100,000 must be subtracted from the anticipated liabilities to arrive at the amount of debt reasonably anticipated by Edgar. Although Fuss did not actually pay the creditors the $100,000, the district court concluded that Edgar thought and intended that Fuss would make this payment. We find no clear error in this factual finding.

Because the district court did not calculate the intended loss within the structure here provided, we must reverse and remand for resentencing. In recalculating the intended loss, the court need not reach an exact number. All the guidelines require is a reasonable estimate of the loss. U.S.S.G. § 2F1.1, comment. (n. 8). Once the court has recalculated the intended loss, it should again compare it to the actual loss, and use the greater amount to determine the appropriate increase in offense level.

### III.

In conclusion, we affirm the district court's denial of a two-level reduction for acceptance of responsibility and its refusal to depart downward from the applicable sentencing range. Because we conclude that the district court incorrectly calculated the intended loss, however, we reverse and remand for further findings consistent with this opinion.

HEANEY, Senior Circuit Judge, concurring in part and dissenting in part.

Judge Warren Urbom is one of our most thoughtful and distinguished judges. He clearly believed that a sentence other than the one he imposed would be most appropriate under the circumstances of this case. Judge Urbom did not impose what he thought to be the proper sentence here, however, because he did not believe he had the authority to do so under the sentencing guidelines. In my view, the Sentencing Reform Act grants district judges this authority, and I would remand to permit Judge Urbom to impose the sentence he feels appropriate. Accordingly, I cannot concur in part II.B. of the court's opinion.

### I.

I start, of course, with the enabling statute, the Sentencing Reform Act of 1984. There, Congress set forth the factors a sentencing judge must consider when imposing sentence.[1] Significantly, the statute

---

**9.** There are clearly some liabilities included in the 1990 figure that were not reasonably foreseeable in 1987. For example, the large amount of insider claims included in the 1990 figure were probably not anticipated by Edgar.

**1.** The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of the subsection. The court, in determining the particular sentence to be imposed, shall consider—
   (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
   (2) the need for the sentence imposed—
   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

   (B) to afford adequate deterrence to criminal conduct;
   (C) to protect the public from further crimes of the defendant;
   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
   (3) the kinds of sentences available;
   (4) the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines that are issued by the Sentencing Commission pursuant to 28 U.S.C. 994(a)(1) and that are in effect on the date the defendant is sentenced;

directs district judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of the subsection." The statute then provides that a guidelines sentence is considered appropriate under these principles and must be imposed, but not if:

> the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.

18 U.S.C. § 3553(b) (1988). If the Commission has not "adequately" taken into consideration mitigating or aggravating circumstances present in a case, then the sentencing court must impose an appropriate sentence "having due regard for the purposes set forth" in 18 U.S.C. § 3553(a)(2) (1988). *Id.*

Under the statute, then, district judges must *first* consider what sentence would best achieve the statutory purposes set forth in section 3553(a): deterrence, incapacitation, the need for treatment and training, and the need for the sentence to reflect the defendant's circumstances and the circumstances of the crime. After considering these matters, the court must *next* consider the sentence or sentences recommended by the guidelines. This reading of the statute is consistent with the Senate Report that explains sections 3553(a) and 3553(b):

> The bill requires the judge before imposing sentence, to consider the history and characteristics of the offender, the nature of circumstances of the offense, and the purposes of sentencing. He is *then* to determine which sentencing guidelines apply to the case. Either he may decide that the guideline recommendation appropriately reflects the offense and offender characteristics and impose sen-

tence according to the guideline recommendation or he may conclude that the guidelines fail to reflect *adequately* a pertinent aggravating or mitigating circumstance and impose sentence outside the guidelines.

S.Rep. No. 98–225, 98th Cong., 2d Sess., reprinted in 1984 U.S.Code Cong. & Admin.News 3182, 3235 (emphasis added). Thus, the district court in each case must look to the "adequacy" of the Commission's consideration of aggravating or mitigating factors present in each case.

The Sentencing Commission, however, has formulated a set of guidelines instructions different than the process outlined in section 3553(a), and has "seemingly reversed the sentencing sequence intended by Congress." Marc Miller & Daniel J. Freed, *Honoring Judicial Discretion Under the Sentencing Reform Act*, 3 Fed. Sentencing Rep. 235–37 (1991). The guidelines set forth a nine-step process for calculating a sentence, but none of these steps require the court to consider the purposes of sentencing or the nature and circumstances of the offense, as set forth in the statute. *Compare* U.S.S.G. § 1B1.1 (setting forth "application instructions") to 18 U.S.C. 3553(a)(2). Like Judge Bright of our court and Chief Judge Merritt of the Sixth Circuit, I believe that the Sentencing Commission has misinterpreted the text of the Sentencing Reform Act in its "application instructions" by telling judges they may consider a downward or upward departure only *after* they have calculated the guidelines range. *See United States v. Quarles*, 955 F.2d 498, 503–05 (8th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 2285, 119 L.Ed.2d 209 (1992) (Bright, J., concurring and dissenting) (expressing view that the sequence of sentencing steps set forth by Sentencing Commission was incorrect); *United States v. Davern*, 937 F.2d 1041, 1043–47 (6th Cir.1991), *on rehearing*, 970 F.2d 1490 (6th Cir.1992). This is no trivial

---

(5) any pertinent policy statement issued by the Sentencing Commission pursuant to 28 U.S.C. 994(a)(2) that is in effect on the date the defendant is sentenced;

(6) the need to avoid unwarranted sentence disparities among defendants with similar

records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a) (1988).

matter, because the Sentencing Commission's process is unduly mechanical and "produces a presumptive sentencing range but ... does not provide a sufficient context in which to consider the facts of the case." Miller & Freed, *supra*, at 237.

The present case is a perfect example of how the Commission's failure to follow the statute has resulted in a sentence that the district court would have found inappropriate had the Commission properly interpreted the statute. Edgar presented an alternative sentencing proposal which, if adopted, would have put Edgar's expertise in computers and statistics to work for the Legal Services of Southeast Nebraska and the Nebraska State Bar Association Pro Bono Program. Under his proposal, Edgar would have developed a case management system for these organizations either while on probation or while serving a ten-month split sentence. Judge Urbom stated that he thought the proposal was "excellent," and that Edgar was *not* one of the people who should be in prison for the *safety of society*, for *punishment*, or for *deterrence*. Although he did not refer to section 3553(a)(2), Judge Urbom plainly considered the factors set forth there and concluded that an alternative to prison would be the best sentence in Edgar's case. If Judge Urbom had been able to follow the sequence anticipated by Congress, he probably would have concluded that the guidelines sentence did not best serve the purposes of sentencing because the guidelines did not adequately reflect mitigating circumstances in Edgar's case, such as Edgar's ability and willingness to help improve the legal services available to poor

people in his area, and the fact that Edgar was not a danger to society.

Judge Urbom, however, imposed a guidelines prison sentence because he felt that under the guidelines, he was bound to follow the sentencing grid and impose the sentence contained therein. It is not difficult to see why Judge Urbom reached this conclusion. First, judges and practitioners have assumed that the Commission's application instructions conform with the Sentencing Reform Act, an assumption that is unwarranted. *See* Miller & Freed, *supra.* Second, although the statute treats departures as an integral part of the guidelines scheme, the appellate courts have been swift to strike down district courts that depart from the guidelines range.[2] Appellate courts seem to presume that the Commission has "adequately" taken into consideration mitigating or aggravating circumstances present in a case even when the Commission has never said a word on the mitigating circumstance in question.[3] *See, e.g., United States v. Prestemon,* 929 F.2d 1275, 1277–78 (8th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 220, 116 L.Ed.2d 178 (1991) (departure based on defendant's status as an adopted child reversed; court finds that Commission adequately took such circumstances into consideration even though guidelines are entirely silent on the subject); *United States v. Pozzy,* 902 F.2d 133, 139 (1st Cir.1990) (although guidelines never mention pregnancy as a mitigating factor, appellate court finds as a matter of law that Commission must have adequately considered it when formulating the guidelines). We do not exhibit such blind defer-

---

**2.** I find this particularly ironic, given that the authors and principal supporters of the guidelines claim that the sentencing guidelines give the district judges much greater discretion than they are using. *See, e.g.,* Gerald B. Tjoflat, *The Untapped Potential for Judicial Discretion Under the Federal Sentencing Guidelines: Advice for Counsel,* 55 Federal Probation 4 (1991); William W. Wilkins, Jr., *Plea Negotiations, Acceptance of Responsibility, Role of the Offender, and Departures: Policy Decisions in the Promulgation of Federal Sentencing Guidelines,* 23 Wake Forest L.Rev. 181, 196 (1988) (departure power gives district judges flexibility to impose individualized sentences). The introduction to the guidelines plainly states that they were intended to

set forth the appropriate sentence in the heartland of cases, not every case, *see* U.S.S.G. Ch. 1, Pt. A4(b) (introduction) (policy statement), but the appellate courts seem to have ignored this policy statement as well as the underlying statute.

**3.** These are astonishing conclusions in light of Congress's specific direction:

In determining whether a circumstance was adequately taken into consideration, the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission.

18 U.S.C. § 3553(b) (1988).

ence when reviewing the rulemaking of other administrative agencies, and practitioners and judges need to take a harder look at the Commission's work product. If this were done, district courts might be less hesitant to depart from the guidelines range and to exhibit more of the "discretion, flexibility and independent judgment" that Congress intended. *United States v. Lara*, 905 F.2d 599, 604 (2d Cir.1990).

## II.

Edgar was a first offender and would have been a good candidate for probation. Although probation is inappropriate for repeat offenders, preguidelines experience suggests that it is very successful for first offenders. U.S. Dep't of Justice, Bureau of Justice Statistics Special Report, *Federal Offenses and Offenders: Sentencing and Time Served* 6–7 & table 7 (1987) (only 3.5% of first offenders had their probation revoked for a violation or a new offense, as compared to 16.9% for offenders with prior prison records placed on probation); P. Texter & D. Huie, *A Statistical Review of the United States Probation Office, Eastern District of Arkansas, 1970–1979: A Study of Recidivism, Supervision and Violations* 90 (1981) (recidivism rate for probationers overall was 18%, but only 10% for first offenders placed on probation among subjects followed for five years after completion of their probation terms). A prison sentence is often unnecessary to achieve the purposes of the criminal law when first offenders are involved, and Congress recognized this in the Sentencing Reform Act:

> The Commission *shall* insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense, and the general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury.

28 U.S.C. § 994(j) (1988) (emphasis added).

The guidelines have not even come close to complying with this mandate. We re-

peatedly see first offenders convicted of non-violent offenses who face prison sentences because the guidelines grid requires prison sentences for first offenders with offense levels of 13 or greater. *See* U.S.S.G. Ch. 5, Pt. A (sentencing table); U.S.S.G. § 5C1.1(f). Where a guideline is not in "sufficiently reasonable compliance with the statutory mandate" we may invalidate it. *United States v. Lee*, 887 F.2d 888, 891 (8th Cir.1989) (invalidating section 2J1.6 of the guidelines for failing to comply with Congressional mandate). Although Congress did not require the Commission to make probation available for all crimes or all offenders, *see United States v. Barrett*, 937 F.2d 1346, 1350 (8th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 322, 116 L.Ed.2d 263 (1991) (sexual abuse), it did express a strong preference for alternatives to imprisonment where the crime was not violent *and* the defendant was a first offender, as is the case here.

## III.

I recognize that Edgar's counsel did not specifically argue the foregoing points before Judge Urbom or before this court. It could be claimed, therefore, that the statutory question is not properly before us, and ordinarily I would have declined to address the issue. Recently, however, our court saw fit to reverse a district court on an issue that was never raised on appeal and never raised in the district court. *See Lufkins v. Leapley*, 965 F.2d 1477 (8th Cir. 1992) (court reverses granting of writ on grounds that constitutional violation was harmless error even though harmless error issue was never raised by the prosecution in state court proceedings, in the United States District Court, or in this court). If an issue so waived by the prosecution may be considered by this court, then I see no reason why we cannot reverse a district court on a point not specifically raised by a defendant below or on appeal.

For the foregoing reasons, I cannot concur in part II.B. of the court's opinion. I concur in all other respects.