**United States Court of Appeals**
FOR THE EIGHTH CIRCUIT

_____

No. 93-3924/3932/94-1031WM
_____

United States of America,　　　　　*
　　　　　　　　　　　　　　　　　　*
　　　　　Appellee/　　　　　　　　*
　　　　　Cross-Appellant,　　　　*
　　　　　　　　　　　　　　　　　　*
　　v.　　　　　　　　　　　　　　* Appeal from the United States
　　　　　　　　　　　　　　　　　　* District Court for the
Jerry E. Wells and　　　　　　　　* Western District of Missouri.
Kenneth R. Steele,　　　　　　　　*
　　　　　　　　　　　　　　　　　　*
　　　　　Appellant/　　　　　　　 *
　　　　　Cross Appellee.　　　　　*

_____

Submitted: July 26, 1997

Filed: October 14, 1997

_____

Before MORRIS S. ARNOLD, Circuit Judge, JOHN R. GIBSON, Senior Circuit Judge, and MELLOY*, Chief District Judge.

_____

MELLOY, Chief District Judge

_____

*The HONORABLE MICHAEL J. MELLOY, Chief United States District Judge for the Northern District of Iowa, sitting by designation.

I.

This matter is before the court pursuant to remand from the United States Supreme Court.

In United States v. Wells, — U.S. --, 117 S.Ct. 921 (1997), the Supreme Court held that materiality is not an element of 18 U.S.C. § 1014, which makes it a crime to knowingly make a false statement for the purpose of influencing the actions of a federally insured bank. The Supreme Court vacated this Court's decision in United States v. Wells, 63 F.3d 745 (8th Cir. 1995), which had held that materiality was an element of § 1014, and remanded the case for consideration of the remaining issues raised by the defendants. See 117 S.Ct. at 931 - 932.

The remaining issues presented by the defendants are (1) whether the defendants have been held to answer for a crime not charged in their indictments and (2) whether the district court's instructions had the effect of improperly directing a verdict against the defendants. The court must also resolve the government's cross appeal, in which it argues the trial court erred in its guideline computations and the imposition of sentence. We affirm the defendant's conviction and reverse and remand for re-sentencing.

Since the background in this case and the underlying facts have been fully explored in this court's prior decision and the Supreme Court decision, we will only set forth those facts necessary to resolve the issues which remain for consideration.

II.

As an initial matter, the government argues that we should not consider either of the defendants' remaining arguments, since, in its view, those arguments could have been raised in the initial appeal to this Court. The defendants could only have raised those arguments, however, if they had anticipated the government's position that materiality is not an element of § 1014, a position that the government adopted for the first time in a supplemental brief to this Court. Since nothing in the conduct of this case up to that point suggested that the government contested the supposed materiality requirement of § 1014, we decline to find that the defendants have waived their right to a consideration of their claims simply because they did not anticipate the government's change of position and brief all ancillary issues resulting from that change of position.

III.

The indictments in this case charged that the defendants made "material" false statements for the purpose of influencing a federally insured bank. While that allegation of materiality was in accord with our precedent at the time, see, e.g., U.S. v. Ribaste, 905 F.2d 1140 (8th Cir. 1990), it is now clear that materiality is not an element of the crime charged. The defendants argue that, regardless of whether materiality is an element of § 1014, materiality is still an element of the offense "as set forth in the indictment," and so the government must prove the materiality of their statements to the satisfaction of a jury. Anything less, according to the defendants, would amount to a violation of their right to be tried only on the charges brought by the

grand jury.

When an indictment includes all of the essential elements of an offense, but also treats other, superfluous matters, the superfluous allegations may be disregarded and the indictment is proper. <u>See</u>, <u>e.g.</u>, <u>Ford v. U.S.</u>, 273 U.S. 593 (1927); <u>U.S. v. Miller</u>, 471 U.S. 130 (1985); <u>U.S. v. Norris</u>, 34 F.3d 530, 532 (7th Cir. 1994); <u>U.S. v. McIntosh</u>, 23 F.3d 1454, 1457 (8th Cir. 1994)("Allegations in the indictment that are not necessary to establish a violation of a statute are surplusage and may be disregarded if the remaining allegations are sufficient to charge a crime").

Since superfluous allegations are not part of the charged offense and may be disregarded, the government is not required to prove those allegations in order to obtain a conviction. <u>See</u> <u>U.S. v. Rosenthal</u>, 9 F.3d 1016, 1023 (2nd Cir. 1993) ("[A]llegations in an indictment that go beyond the essential elements which are required for conviction do not increase the Government's burden"). All the government need do is prove "that the defendant is guilty of every element of the crime with which he is charged[.]" <u>See</u> <u>U.S. v. Gaudin</u>, 115 S.Ct. 2310, 2313 (1995). That was done here, since all the essential elements of § 1014 were submitted to the jury and a conviction resulted.

Striking superfluous allegations does not result in an impermissible constructive amendment of an indictment. As we explained in <u>U.S. v. Begnaud</u>, 783 F.2d 144 (8th Cir. 1986), a constructive amendment occurs when the jury is "allowed ... to convict the defendant of an offense different from or in addition to the offenses alleged in the indictment." 783 F.2d at 147; <u>see generally</u> 24 *Moore's Federal Practice*, § 607.06[1]

(Matthew Bender 3rd Ed. 1997). Paring down an indictment so that it alleges just the essential elements of an offense does not expose a defendant to the risk of being convicted of any additional or different offenses. See, e.g., U.S. v. Helmsley, 941 F.2d 71, 91 - 92 (2nd Cir. 1991)(allegation in indictment that items of income omitted from tax returns were "substantial" was surplusage not essential to offense and could be dropped from indictment); U.S. v. Bledsoe, 898 F.2d 430 (4th Cir. 1990)(holding that deleting word "public" from an indictment charging defendant with selling drugs within 1000 feet of a "public" secondary school was not an impermissible amendment when statute prohibited drug selling within 1000 feet of any secondary school). The charged offense is the same throughout, and so the court has not "permit[ted] a defendant to be tried on [a] charge that [is] not made in the indictment against him." Stirone v. U.S., 361 U.S. 212, 217 (1960); Helmsley, 941 F.2d at 92.


IV.


Although the jury in this case did not have to determine materiality, it did have to determine whether the defendants made false statements for the purpose of influencing the actions of a federally insured bank. The district court gave the following instruction on the meaning of "false statement":

> A statement or representation is "false" when it is untrue
> when made or effectively conceals a material fact. A material fact
> is a fact that would be important to a reasonable person in deciding
> whether to engage or not to engage in a particular transaction.
> ...

> The materiality of the statement or representation alleged to be false or concealed is not a matter with which you are concerned and should not be considered by you in determining the guilt or innocence of the defendant.

The defendants argue that the statement by the court that materiality is not an issue that should concern the jury had the effect of improperly directing a verdict for the government on the issue of falsity of the statement. We agree that in light of the Supreme Court decision in this case, any reference to materiality in the jury instruction is unnecessary and has the potential to cause confusion. However, we have repeatedly held that an instruction that may be less than a model of clarity does not require reversal, provided that the instruction does accurately set out the elements of the offense which the government much prove. See Toro Co. v. R & R Products Co., 787 F.2d 1208, 1215 (8th Cir. 1986); Roth v. Black & Decker, Inc., 737 F.2d 779, 783 (8th Cir. 1984); Stoetzel v. Continental Textile Corp. of America, 768 F.2d 217, 224 (8th Cir. 1985); Gander v. FMC Corp., 892 F.2d 1373 (8th Cir. 1990).

In this case the jury was instructed that, in order to convict, it had to find that the statements at issue were either untrue when made or effectively concealed a material fact. The instruction went on to state that "the materiality of the statement or representation alleged to be false or concealed is not a matter with which you are concerned . . ." (emphasis added). Reading the instructions as a whole, there can be little doubt that the jury was properly instructed that it had to find the alleged false statement to be untrue or to have effectively concealed a fact, and that making the false statement or concealing the fact was done with the intent to influence the bank's actions. See Wells, 117 S.Ct. at 931. Although there may be superfluous language in

-6-

the instruction, the government's burden of proof is correctly stated in the instruction. We cannot agree with the defendants that the court's statement concerning materiality would have the effect of directing the jury to find that the statement were also untrue.

The district court's instruction did not displace the jury from its proper role of determining the factual question of whether the defendants made false statements for the purpose of influencing the bank. Accordingly, the district court's instructions did not invade the province of the jury.

V.

We turn last to the government's sentencing appeal. The district court sentenced the defendants under § 2F1.1 of the federal sentencing guidelines, which covers "Offenses Involving Fraud or Deceit." The crimes under this section carry a Base Offense Level of 6. U.S.S.G. § 2F1.1(a). The district court increased the base level by 4, based on its determination that the defendants did not intend to cause any loss to the banks, and that the actual loss to the banks was over $20,000 but not more than $40,000. U.S.S.G. § 2F1.1(b)(1)(E). The court declined the government's request to increase the base level another 2 points based on more than minimal planning. U.S.S.G. § 2F1.1(b)(2). The court then decreased the base level from 10 to 8 based on its finding that the defendants played a minor role in the offense. U.S.S.G. § 3B1.2(b).

When the government challenges sentences imposed under the federal sentencing guidelines, we review a district court's factual findings for clear error, and the district court's application and construction of the guidelines de novo. United States v. Ballew,

40 F.3d 936, 943 (8th Cir. 1994); United States v. Rayner, 2 F.3d 286, 287 (8th Cir. 1993). Because each alleged error by the sentencing court in this case concerns a finding of fact, we review each for clear error. *See* United States v. Earles, 955 F.2d 1175, 1180 (8th Cir. 1992)(calculation of fraud related loss reviewed for clear error); United States v. Lublin, 981 F.2d 367, 370 (8th Cir. 1992)("more than minimum planning" determination reviewed for clear error); United States v. Hale, 1 F.3d 691, 694 (8th Cir. 1993)(status as minor participant reviewed for clear error). A finding is clearly erroneous when the reviewing court, on the basis of all the evidence, is left with the definite and firm conviction that a mistake has been made. United States v. Cabbell, 35 F.3d 1255, 1260 (8th Cir. 1994); Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511 (1985). Where there are two permissible views of the evidence, the district court's choice between the two cannot be clearly erroneous. Bessemer City, 470 U.S. at 574, 105 S.Ct. at 1511-12. Where the appellant challenges the construction or application of the sentencing guidelines in arriving at its finding of fact, we will review de novo.

**A.   Loss**

The government challenges the district court's calculation of the "loss" associated with the defendants' fraud and, consequently, its calculation of the base offense level under the federal sentencing guidelines. "Loss" under the guidelines is the greater of the intended loss or the actual loss. U.S.S.G. § 2F1.1(b) App. Note 7.[2]

---

[2]      The method of measuring loss under § 2F1.1 varies depending on the type of fraud involved. Application note 7(a) governs loss in frauds involving misrepresentation of the value of an item or product, and application note 7(b)

The burden of proving the extent of the loss falls on the Government, who must prove the extent of loss by a preponderance of the evidence. United States v. Mills, 987 F.2d 1311, 1315 (8th Cir. 1993).

The government claims that the sentencing court erred in its determination that the intended loss was less than the actual loss caused by the defendants' fraud. The court determined that the appellants did not intend to cause any loss, and therefore

---

governs fraudulent loan application cases. § 1B1.2 of the Sentencing Guidelines instructs a sentencing court to determine the offense level based on the section from Chapter Two that is "most applicable to the offense of conviction." Similarly, where the commentary to the applicable section of Chapter Two includes several application notes that describe alternative methods of computing the offense level depending on the particular facts of the case, the sentencing court should choose the "most applicable" application note.

The instant case involved the sale or assignment of the right to future lease payments. Although it is a common business practice for lenders to take an assignment of accounts receivable as security for loans, *see e.g.* In re B. Hollis Knight Co., 605 F.2d 397, 399 (8th Cir. 1979); Rigby Corp. v. Boatmen's Bank & Trust Co., 713 S.W.2d 517, 521 (Mo. Ct. App. 1986), such an assignment can be made either as the sale of the accounts receivable under a lease or as the granting of a security interest in conjunction with a loan. When disputes arise over the true nature of the transaction, courts look to the contract to ascertain the parties' true intent. In re CIS Corp., 172 B.R. 748, 756 (S.D.N.Y. 1994); People v. The Service Institute, Inc., 101 Misc. 2d 549, 421 N.Y.S.2d 325, 326 (Sup. Court Suffolk County 1979).

The record appears to indicate that the transactions were an assignment of the leases to the bank based on discounted cash flow. However, the record also reflects the intent of both parties to treat the transactions as loans secured by an assignment of the lease payments, at least for the purpose of determining losses under the contracts. Both parties' evidence of loss at sentencing treated the transaction as a loan and neither party objected to the court's application of note 7(b). Accordingly, note 7(b) is the most appropriate method of calculating loss.

found the intended loss was zero. Because the court then found that the actual loss was $40,000, the court used the greater actual loss figure to determine the extent of the base offense level increase.

Application Note 7 to § 2F1.1 of the federal sentencing guidelines provides that "loss" is "the actual loss to the victim [unless] the intended loss is greater than the actual loss, [in which case] the intended loss is to be used." See U.S.S.G. § 2F1.1 App. Note 7; United States v. Little, 990 F.2d 1090, 1093 (8th Cir. 1993).

The government claims that "intended loss", as used in § 2F1.1, is measured by the potential loss or possible loss that could arise from the charged crime, not by the amount of loss that the defendant intended to cause. Under this view, "intended loss" is shorthand for "the possible loss that could have resulted regardless of what the defendant intended the loss to be." Because the banks that were harmed by the defendants' fraud could possibly have lost an amount equal to the full value of the money transferred, the government argues that the intended loss was greater than the actual loss, and should have been used to calculate the increase in the base offense level. We review de novo, as this relates to the application and construction of the guidelines. Ballew, 40 F.3d at 943; Rayner, 2 F.3d at 287.

The government cites a number of decisions of this court in support of its claim that the focus for sentencing purposes under § 2F1.1 should be on the amount of *possible* loss that could have been caused by the defendants' conduct. United States v. Morris, 18 F.3d 562, 570 (8th Cir. 1994); United States v. Kok, 17 F.3d 247, 250 (8th Cir. 1994); United States v. Prendergast, 979 F.2d 1289, 1292 (8th Cir. 1992);

United States v. Johnson, 908 F.2d 396, 398 (8th Cir. 1990). Although we have never interpreted them that way, see, e.g., U.S. v. Anderson, 68 F.3d 1050 (8th Cir. 1995); U.S. v. Sheets, 65 F.3d 752 (8th Cir. 1995); U.S. v. Graham, 60 F.3d 463 (8th Cir. 1995), the government argues that these cases stand for the proposition that the sentencing court should measure intended loss by the possible or potential losses that could occur due to a defendant's fraud, not by the amount of loss that the defendant intended to cause. We disagree. Instead, a review of those cases shows that we have interpreted "intended loss" to mean just that — the loss the defendant intended to cause to the victim. The amount of possible loss is just one element of proof to be considered, along with all other evidence, on the issue of intended loss.

In Morris, for example, the plaintiff had been convicted of fraud in relation to a check kiting scheme involving checks drawn on accounts with insufficient funds. 18 F.3d at 564. Before the scheme was discovered, the defendant caused some money to be paid back into one of the accounts, thus decreasing the actual loss suffered by the wronged bank. The district court reduced the amount of loss for sentencing purposes by the amount that had been repaid into the account. We reversed because the evidence at trial showed that the money was repaid only to avoid detection of the fraud. Id. at 570. Implicit in our decision was an understanding that the defendant, at the time he committed the fraud, had intended to succeed to the full amount of the check and to cause all the loss that could possibly be caused by the bad check. The fact that the defendant later paid some of the money back did not alter the amount of lossintended when the crime was committed. In that situation, the intended loss was properly measured by the possible loss, and did not hinge on actual or net loss. Id.

-11-

In Prendergast, the defendant was convicted of selling fraudulent promissory notes totaling $280,000. 979 F.2d at 1290. Prior to sentencing, the defendant made compensatory payments to his victims of about $110,000. Id at 1291. The district court reduced the amount of loss for sentencing purposes by the amount of reimbursements made, finding that the loss was $170,000. Id. We reversed. Again, there was no evidence that the defendant intended, at the time he committed the fraud, to deprive his victims of anything less than the full value of the fraudulent notes. Id. Where there is no evidence that a defendant intended to cause any less than all losses possible from his fraud, the amount of loss for sentencing purposes does not hinge on the actual or net loss, but instead, is found by determining the intended loss as measured by the possible loss. The common thread in both Morris and Prendergast is that the repayments were made after the fact only in order to conceal, or reimburse victims, for crimes that had already been committed. The focus was on the defendant's intent at the time he committed the fraud.

In Johnson, the defendant obtained a number of loan disbursements through fraud, applying the loan money toward the purchase of two cars. 908 F.2d 396. At sentencing, the district court measured the amount of loss by the sum total of the loan disbursements obtained by the defendant, rather than by the actual loss suffered by the bank after reselling the cars and collecting insurance proceeds. Id. at 398. Under the then-applicable App. Note 7 to § 2F1.1 (prior to revision), "if a probable or intended loss that the defendant attempted to inflict can be determined, that figure would be used if it was larger than the actual loss." Id. We affirmed the court's finding that the probable or intended loss was greater than the actual loss, and that therefore, the loss did not hinge on the actual loss. Id. There was no indication that the defendant had

intended to repay, or that it was probable that the defendant would repay, any portion of the loans. If the court had found that the defendant had intended to repay the loan in full (and, under the then-applicable Application Note 7, that it was probable), the court could properly have found that the intended loss was zero and used the actual loss for sentencing purposes.

In each of those opinions, we recognized that the loss for sentencing purposes in fraud cases does not hinge on actual loss if the court determines either that the defendant intended to succeed to the full extent of the fraud, or that there was no evidence that the defendant intended to cause less than the greatest possible loss. We held, that in those circumstances, the intended loss can properly be measured by the possible loss, since the defendant intended to cause that possible loss. Where there is evidence of the extent of the loss the defendant intended to cause, however, we have held that the crucial question for determining intended loss for sentencing purposes is the loss that the defendant actually intended to cause. See, e.g., United States v. Edgar, 971 F.2d 89, 96 (8th Cir. 1992).

In Edgar, the defendant was convicted of a fraud committed while acting as bankruptcy attorney for Duplitech Corporation, a copying and printing business. 971 F.2d at 92. The fraud consisted of arranging for the sale of certain assets out of an estate in bankruptcy, thus defrauding creditors of the value of the property transferred. In making that fraudulent transfer, however, the court found that the defendant intended that the purchaser of the transferred assets would pay $100,000 to the creditors. Id. at 96. We held that the district court should subtract the amount that the defendant intended would be repaid from the possible loss, even though it was possible that the

-13-

payment would not be made. Id.

United States v. Anderson, 68 F.3d 1050 (8th Cir. 1995), makes clear that the maximum potential loss is only one fact to consider in determining intended loss under U.S.S.G. 2F1.1.  In Anderson, the district court found that the defendant intended to cause less than "the maximum potential loss" associated with his conduct, 68 F.3d at 1055, and so used a lower intended loss amount to calculate the defendant's sentence. 68 F.3d at 1055.  The district court expressly rejected the notion that possible loss was to be used in calculating the amount of loss when the evidence showed that the defendant intended to inflict something less than the possible loss.  See 68 F.3d at 1054 *n.* 3.  The Anderson court held that "the district court did not misinterpret the Guidelines," 68 F.3d at 1055, and noted that "[t]he district court did not look to the maximum potential loss from the situation but [instead] *very properly* considered the amount of potential loss that [the defendant] intended to inflict[.]" 68 F.3d at 1055 (emphasis added).

In summary, the method used by a sentencing court to determine "loss" depends, in the first instance, on the court's factual finding of the intent of the defendant to cause loss and on the court's factual finding of the extent of actual loss.  Under Application Note 7 to § 2F1.1 of the guidelines, the loss for sentencing purposes is the greater of the intended loss or the actual loss.  Each of these factual findings will only be overturned for clear error. Ballew, 40 F.3d at 943; Rayner, 2 F.3d at 287.

Where a court determines that a defendant intended to succeed to the full extent of the fraud or where there is no indication that the defendant intended to cause less

-14-

than the greatest possible loss, the intended loss is the possible loss. We reject the government's position, however, that the intended "loss" is always measured by the possible or potential loss. Where the evidence is sufficient to support a sentencing court's determination that a defendant intended to cause less than the possible or potential loss that could result from the fraud, "loss" is properly measured by the defendant's intent. Edgar, 971 F.2d at 96. As in Edgar, where the evidence shows the amount that a defendant intended to be repaid, the court can use the possible loss as a baseline measure of loss, and subtract the intended repayment.

The district court did not commit clear error in determining that there was no intention to cause the bank a loss. The court's finding is supported by evidence on the record and we are not left with the definite and firm conviction, on the entire evidence, that a mistake has been committed. Cabbell, 35 F.3d at 1260; Bessemer City, 470 U.S. at 573, 105 S.Ct. at 1511. The district court judge who presided over the entire trial and sentencing was in a much better position than we are to weigh the credibility of the witnesses and determine the motivations and intent underlying the defendants' actions. The district court judge determined that the defendants intended that the copier lessees would make all of the payments due under their CMP lease assignment agreements. Based on that finding, the sentencing court found that the intended loss, under § 2F1.1, was zero. This determination was supported by other evidence in the record, including evidence that one of the defendants had put over $2 million of his own money into Copytech to keep it in business and that protective clauses in the lease and assignment contracts indicated an intent to shield the banks from loss. The government, for its part, has not pointed out sufficient evidence to detract from the court's finding. The sentencing court's determination that the intended loss was zero is not clearly

erroneous.

Because the sentencing court found that the intended loss was zero, it went on to calculate the actual loss caused by the defendants' fraud. The government appeals the court's determination that the two banks harmed by the defendants' fraud suffered actual losses in the amount of only $40,000, raising both a factual dispute and a legal dispute. First, the government contends that the court's calculation of actual loss was clearly erroneous. Second, the government argues that the method the court used to calculate the loss was legally insufficient.

"Loss" under § 2F1.1 is defined to mean:

> [T]he actual loss to the victim . . .For example,
> if a defendant fraudulently obtains a loan by
> misrepresenting the value of his assets, the loss is the
> amount of the loan not repaid at the time the offense
> is discovered, reduced by the amount the lending institution
> has recovered (or can expect to recover)
> from any assets pledged to secure the loan.

U.S.S.G. § 2F1.1 App. Note 7(b). The amount of loss is generally a factual finding, reviewed for clear error. Ballew, 40 F.3d at 943. The court need not determine the value of the loss with any degree of precision; a reasonable estimate of the loss based on the available evidence will suffice. Anderson, 68 F.3d at 1054; U.S.S.G. § 2F1.1 App. Note 8.

Although the loss does not have to be determined with precision, the text of the guidelines provides guidance as to what should be included and excluded from the loss.

Application Note 7 of § 2F1.1 provides that the loss includes "the amount of the loan not repaid at the time the offense is discovered" and should be reduced by the amount that the lender has "recovered, or can expect to recover, from any assets pledged to secure the loan." Although the rights to receive future payments under the copier leases were assigned to the banks, not "pledged to secure" a loan, the court nevertheless explicitly reduced the amount of loss by the extent of recoveries made by the bank prior to sentencing, payments that the banks could expect to receive in the future, and by the amount O'Bannon bank stood to recover based on a judgment it had received against one of the lessees.

The government submitted evidence that the banks had charged off approximately $1.2 million in losses on their Copytech accounts. Although the government bore the burden of proving the extent of loss by a preponderance of the evidence, it did not offer any evidence on the number of lease accounts that were still active, on the amount that the banks had recovered since their loss calculation, or on the amounts that the banks could expect to recover in the future. Defense evidence showed that O'Bannon Bank had received a judgment against one of Copytech's customers in the amount of $747,000, that Bank IV had not accounted for the value of recovered copier equipment, and that Bank IV was still servicing some active copier leases and receiving monthly payments on them.

In reaching its finding on the amount of actual loss, the court reduced the loss by the amount of recovery that the banks had recovered or could expect to recover, and by the amount of O'Bannon Bank's judgment against one of Copytech's customers. Given the defense evidence of future recovery, and the absence of government evidence

on the amount that the banks could actually expect to recover, the court's estimate of a $40,000 loss was not clearly erroneous, and must therefore be affirmed. Mills, 987 F.2d at 1315.

The government's primary objection to the court's estimate of a $40,000 loss is that the court did not apply the guidelines correctly and had no legal basis for deducting future recovery of lease payments from the actual loss calculation. Specifically, the government claims that since the money recovered, or expected to be recovered, from lease payments or from O'Bannon's judgment against Copytech's customer is not an "asset[] pledged to secure the loan", that the court erred in deducting those amounts from the loss calculation. This dispute relates to the application of the guidelines, and is reviewed de novo. Ballew, 40 F.3d at 943; Rayner, 2 F.3d at 287.

Despite the fact that the copier lease assignments may, technically, have been sales and assignments of Copytech's interest in the lease accounts, the most appropriate guideline for the determination of the offense level in this case is § 2F1.1 and Application Note 7(b), relating to fraud in loan application cases. *See supra*, note 3. To the extent that the transactions are treated as loans by analogy for sentencing purposes, the text of Application Note 7(b) must be read in that light and construed consistently with the actual nature of the transactions.

If the banks in this case had lent Copytech money, secured by a security interest in the stream of lease payments, instead of purchasing an assignment of the right to receive future payments, the treatment of recovery and expected recovery against those accounts would be clear. Under Application Note 7(b), those recoveries would be

deducted from the loss calculation as recovery of assets pledged to secure a loan. In this case, however, Copytech did not pledge its interest in future lease payments as security in the event of default, but instead made an outright assignment of its entire interest in those payments to the bank.

The right to collect future payments based on an assignment of that right protects the bank to the same extent as does the right to collect future lease payments after asserting the rights or a secured creditor to collect the payments.[3]  In both cases the bank's interests are protected to the extent of monies recovered from lease payments. Since the transaction itself is being treated, by analogy, as a "loan", the banks' interests in receiving future lease payments can properly be treated, by analogy, as assets pledged to secure that "loan".  The district court did not err in deducting future lease payments and recoveries from the loss calculation.

## B.    Minimal Planning

The government argues that the sentencing court erred by not increasing the base level of the defendants' offense by two points for more than minimal planning. U.S.S.G. § 2F1.1(b)(2)(A).  More than minimal planning "is deemed present in any case involving repeated acts over a period of time, unless it is clear that each instance was purely opportune."  United States v. Callaway, 943 F.2d 29, 31 (8th Cir. 1991)(*quoting* U.S.S.G. § 1B1.1, comment.  Note 1(f)).  "Almost any crime that

---

[3]  In fact, Article 9 of the U.C.C., governing secured transactions, is applicable to the sale of accounts receivable under a lease. *See* Mo. Rev Stat. §§ 400.9-102, 106.

consists of a pattern of activity over a long period of time would qualify as an offense involving more than minimal planning." United States v. Olson, 22 F.3d 783, 786 (8th Cir. 1994)(*quoting* West, 942 F.2d at 531).

The defendant in Olson had been convicted on several counts of wire fraud, securities fraud, racketeering, misapplication of bank funds and related crimes. Although the offenses that formed the basis of the conviction occurred over a two-year period of time, the trial court declined to increase the defendant's level for more than minimal planning. Id. This court held that it was clear error by the trial court to deny the increase in offense level, due primarily to the length of time during which the charged crimes took place.

The government argues that the court erred in not applying the two point increase for more than minimal planning, which in the government's view is called for by the duration of the conspiracy, from late 1986 or early 1987 until May 1990. In addition, the government argues that the conspiracy involved repeated acts over that period of time that were not merely opportune, including consistently concealing the existence of the CMP addenda from the banks, changing the language of the lease documents, forging the personal guaranties of their wives, and selling ninety CMP lease contracts to the banks.

At sentencing, the district court stated the defendants' objection to the presentence report and stated, "If there was more than minimal planning, it was on the part of Mr. Russell, not on the part of these defendants." However, the focus of the "more than minimal planning" language is the nature of the offense, not the nature of

a defendant's role in that offense.  *See* United States v. West, 942 F.2d 528, 531 (8th Cir. 1991)(*citing* U.S.S.G. § 2F1.1(b)(2)).

We conclude that the court clearly erred by not assessing  the more than minimal planning enhancement.  The conspiracy spanned a period of time in excess of three years, involved more than ninety sales of CMP contracts, and featured personal participation by each defendant in the forging of the guarantees with their wives' names.  Given these factors, we conclude the court clearly erred in not assessing the two point enhancement for more than minimal planning.

## C.    Minor Participant

The sentencing court decreased the base offense level by two points for being minor participants. U.S.S.G. 3B1.2(b).  A minor participant is any participant who is less culpable than most other participants. Id.  Although the mere fact that a defendant is less culpable than a co-defendant does not entitle the defendant to "minor participant" status as a matter of law, the judicial determination of whether a person is a minor participant is a factual determination that we review for clear error. Hale, 1 F.3d at 694. The sentencing court determined that James Russell was in charge of the day-to-day affairs of the company and that these defendants were minor participants in the conspiracy.  We cannot say that the sentencing court clearly erred in making that finding.

VI.

-21-

In summary, we affirm the defendants' convictions and remand for re-sentencing in accordance with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT