# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 97-3207

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of South Dakota |
| F. Butch Oseby, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: March 10, 1998
Filed:   July 8, 1998

_____

Before BEAM and HEANEY, Circuit Judges, and WATERS,[1] District Judge.

_____

WATERS, District Judge.

F. Butch Oseby appeals his conviction and sentence for conspiring to defraud the United States and giving a gratuity to a public official.  Oseby contends that the district court erred when it: (1) unforeseeably expanded a federal statute; (2) improperly admitted statements made by a co-conspirator; and (3) miscalculated loss under the sentencing guidelines.  For the reasons stated below, we affirm Oseby's conviction, but vacate his sentence, and remand for further proceedings consistent with this opinion.

_____

[1]The Honorable H. Franklin Waters, United States District Judge for the Western District of Arkansas, sitting by designation.

## I.  Background

### A.  The Federal Excess Property Program

Congress enacted the Federal Property and Administrative Services Act of 1949 (the "Act"), "to provide for the Government an economical and efficient system for (a) the procurement and supply of personal property . . .; (b) the utilization of available property; (c) the disposal of surplus property; and (d) records management."  40 U.S.C.A. § 471 (1986).  Under the Act, the General Services Administration ("GSA") has the authority to oversee the transfer of all "excess property."  See generally 40 U.S.C.A. § 483(a)(1) (1986).  Excess property is essentially personal property that has outlived its usefulness to a federal agency.[2]  "Property that has outlived its usefulness to the Federal Government is declared 'surplus' and may be transferred to private or other public entities."[3]  Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 466-67 (1982) (footnote omitted).

Federal agencies are responsible for reporting and transferring excess property, and for filling their requirements for personal property through other federal agencies.  See generally 41 C.F.R. § 101-43.102 (1997).  A request for personal property must be directed to the appropriate GSA regional office which, in turn, screens the request against lists of excess property available.  See generally 41 C.F.R. § 101-43.302 (1997).  GSA then determines whether to fill the request with available excess property, or to authorize the purchase of new or replacement property.  Id.

---

[2]The Act defines "excess property" as "any property under the control of any Federal agency which is not required for its needs and the discharge of its responsibilities, as determined by the head thereof."  40 U.S.C.A. § 472(e) (1986).

[3]The Act defines "surplus property" as "any excess property not required for the needs and the discharge of the responsibilities of all Federal agencies, as determined by the Administrator [of General Services]."  40 U.S.C.A. § 472 (g) (1986).

After GSA receives a report of excess property, a "screening period" follows. See 41 C.F.R. § 101-43.001-30 (1997). The screening period is the period during which excess property is available to federal agencies. A "screener" is an individual who physically visits places where excess property is being stored to determine if it is appropriate for the needs of a federal agency.

To minimize delays in screening excess property and to make property available more quickly and efficiently, GSA permits non-federal agency individuals to act as screeners for federal agencies. See generally 41 C.F.R. § 101-43.315 (1997). A federal agency can request that GSA certify an individual as a screener to act as a representative of that federal agency in procuring excess property. Id.

When a screener locates a piece of excess property that a federal agency needs, the agency must request approval from GSA to transfer the property. All transfers of excess personal property made between federal agencies are by Standard Form 122 ("SF 122"). See 41 C.F.R. § 101-43.309-5 (1997). An official from the requesting federal agency must sign "Block 9" of the SF 122. See 41 C.F.R. § 101-43.4901-122-1 (1997). The SF 122 is then sent to GSA for approval. The excess property will not be transferred unless these signatures are obtained.

## B. Amendments to the Indian Self Determination Act

The Indian Self Determination Act (the "ISDA"), allows federally recognized Indian tribes to enter into contracts with the Federal Government to administer a wide variety of programs ("self-determination contracts"). See generally 25 U.S.C.A. § 450f (Supp. 1998). Prior to the 1988 amendments to the ISDA, excess property could be transferred to an Indian tribe by way of donation, but not through the excess federal property program described above. The 1988 amendments to the ISDA provided that the Bureau of Indian Affairs (the "BIA") could donate any BIA excess personal and real property to an Indian tribe or tribal organization in connection with any self-determination contract. See 25 U.S.C.A. § 450j(f)(2) (Supp. 1998). In addition, the

–3–

1988 amendments permit the BIA to acquire excess or surplus property through GSA for use on any self-determination contract, which, in effect, puts Indian tribes and tribal organizations on the same level as federal agencies in regard to the acquisition and utilization of excess federal property. See 25 U.S.C.A. § 450j(f)(3) (Supp. 1998)

## C. Oseby's Role as a Screener

In early 1991, Oseby began having discussions with Russell Hawkins, chairman of the Sisseton-Wahpeton Sioux Tribe (the "SWST"), and Gerald German, head of the road maintenance department for the SWST, regarding the SWST's acquisition and use of excess federal property. The SWST had a self-determination contract with the Federal Government for road maintenance on its tribal lands, and, thus, it could acquire property through the excess federal property program for use on this contract. Hawkins explained to Oseby that if the SWST could sell some of its excess property, it could use the money to obtain better equipment for its roads department. In April of 1991, Oseby became a 24.5% shareholder in Dakota Machine Equipment ("DME"), a South Dakota corporation. DME bought and sold new and used equipment. The other shareholders were Warren Barse and Donald L. Jerke. DME became the vehicle for the purchase of excess federal property from the SWST.[4]

Thereafter, Oseby became certified as a screener for the SWST. Roger Raether was also appointed as a screener for the SWST. As screeners, Oseby and Raether located excess property and transferred it to the SWST. Although excess property may be held at any federal agency, Oseby screened excess property from the Department of Defense. Specifically, Oseby screened property from Department of Defense facilities called Defense Re-utilization and Marketing Offices ("DRMO"). After the property was transferred to the SWST, the SWST would sell the excess property to DME. DME would then turn around and sell the excess property for a much larger

---

[4]DME was not just in the business of buying and selling excess property. It also bought and sold other varieties of equipment.

price than it paid the SWST. Oseby testified that the SWST received approximately 10% of the proceeds from the sale of excess property. The screeners also received a 13% share of the proceeds. The remainder of the proceeds went to DME.

In order to obtain the necessary approval on the GSA transfer form, Oseby had to enlist his friend, Charles Hacker, who was a BIA employee, and, at one time, married to Gerald German's daughter. Hacker asked for and received authority to sign as an approving official for all the transfers of excess property to Indian tribes in the country. Hacker signed as the BIA approving official in Block 9 of the SF 122s for the transfers of excess property to the SWST. In fact, Hacker gave Oseby pre-signed, or pre-approved, SF 122s for him to use in acquiring excess property for the SWST. Thus, in most instances, Hacker never knew what excess property Oseby was screening until he received a copy of the approved SF 122. Oseby was convicted of giving Hacker cash payments of several thousand dollars to induce Hacker to participate in this plan.

Before Oseby began screening property for the SWST, however, Oseby, Hawkins, Raether and others met with various Federal Government officials and attorneys regarding the legality of the SWST acquiring excess federal property and then immediately selling it. Oseby contends that he attended several meetings and discussions on the issue, and, based on the advice of counsel, he believed that it was legal for the SWST to sell excess federal property. Specifically, Oseby received a legal opinion from Bert Hirsch, general counsel for the SWST, in which Hirsch stated that once the SWST received excess property, the property became tribal property free and clear of any encumbrances, and, thus, the SWST could dispose of it without restriction.

In the beginning, there was some confusion among employees at the Department of Interior and GSA regarding whether or not tribal organizations could dispose of excess property as soon as they received it, without ever using the property, and pocket the proceeds. Due to this confusion, Bobby Givens, Manager of Personal Property

Services of GSA, in a memorandum dated January 22, 1992, halted all transfers of excess property to the SWST pending further investigation of the issue. Oseby testified that he received a copy of this memorandum from either Hacker or Raether. In April of 1992, Grant Beattie, Deputy Director of Property Management for GSA, issued a memorandum stating that representatives of the Department of Interior and the Department of Health and Human Services had informed GSA that the immediate sale by tribal organizations of excess property was not in compliance with their interpretation of the Act. As a result, Beattie ordered that all SF 122s submitted by BIA for excess personal property could only be approved if the excess property was intended for use in connection with a self-determination contract.

Oseby testified that he realized that these memoranda meant that he could no longer screen property that was intended for immediate sale by the SWST. Oseby further testified that he talked to Hacker about the implications of these memoranda. Thereafter, Oseby began stating on the SF 122s that the excess property was intended for use "in conjunction with" the SWST's self-determination contract. GSA was intentionally given the false impression that the SWST did not intend to sell the excess property, and thus, GSA continued to approve the transfers of excess property to the SWST. Oseby testified that he believed that as long as the SWST used the "proceeds" from the sale of excess property on its self-determination contract, then the sale was in compliance with the Act. Oseby admitted, however, that he understood GSA's position - he just did not agree with it.[5]

---

[5]We note that the district court instructed the jury that "good faith" was a defense to the charges against Oseby. Specifically, the court, in Instruction 36, told the jury that "an honest mistake" in judgment does not rise to the level of criminal intent. The court also instructed the jury, however, that "mere disagreement" with the law, did not constitute good faith misunderstanding of the law, and as such, was not a valid defense to the charges.

## D. Co-Conspirator Statements

A search was conduced of Raether's residence in January of 1994, and several memoranda from Raether to Hawkins regarding the sale of excess property were discovered. The memoranda generally state Raether's ideas for fighting the GSA on the issue of whether Indian tribes could sell excess property without using the property. The language from the memoranda show that Raether was aware of GSA's position that Indian tribes were not permitted by law to sell excess property.

## E. Procedural Background

The United States originally named Hacker, DME, Oseby, Raether and Jerke in an indictment charging them with conspiracy to: (1) make false statements of material facts in violation of 18 U.S.C.A. § 1001; (2) misapply tribal funds in violation of 18 U.S.C.A. § 666; and (3) convert funds belonging to Indian tribes or tribal organizations in violation of 18 U.S.C.A. § 1163. The defendants filed a motion to dismiss, contending that Congress intended to exempt Indian tribes from compliance with the Act when it amended the ISDA in 1988. The district court denied their motions to dismiss. See United States v. Hacker, 883 F. Supp. 444 (D.S.D. 1994). Raether and Hawkins were ultimately tried together and were found guilty, however, their verdicts were overturned and the district court granted a new trial, which this court affirmed. See United States v. Raether, 82 F.3d 192 (8th Cir. 1996). Raether was subsequently retried alone and was found guilty. He appealed his convictions based on the defense of legal impossibility, and we affirmed his convictions without opinion.

On September 19, 1996, the government issued an indictment charging Oseby with conspiracy to: (1) make false statements of material facts in violation of 18 U.S.C.A. § 1001; (2) misapply tribal property in violation of 18 U.S.C.A. § 666(a)(1)(A); and (3) convert property belonging to Indian tribes or tribal organizations

in violation of 18 U.S.C.A. § 1163.[6]  Oseby was also charged with bribery of a public official in violation of 18 U.S.C.A. § 201(b).  On February 21, 1997, Oseby was convicted of conspiracy and of giving an illegal gratuity to a public official, the lesser included offense, in violation of 18 U.S.C.A. 201(c).

## II.  Violation of Oseby's Due Process Rights[7]

Oseby moved to dismiss the conspiracy count based on the defense of legal impossibility.  He contended that it was not illegal to sell excess property during the time he was screening, and thus, conspiracy to sell excess property could  not constitute a crime.  The magistrate denied Oseby's motion, relying on the district court's opinion in Hacker.  Oseby does not dispute the validity of the district court's decision in Hacker. Instead, he argues that Hacker was an unforseen judicial enlargement of the statutes. Oseby contends that when the holding in Hacker was applied retroactively to his case, he was denied due process of the law.  Specifically, Oseby asserts that the court's instructions to the jury, which contained a statement of the law as determined by Hacker, substantially prejudiced his defense.  The issue of whether a constitutional violation has occurred is subject to the court's *de novo* review.  Stallings v. Delo, 117 F.3d 378, 380 (8th Cir.), cert. denied, 118 S. Ct. 393 (1997).

---

[6]Count two of the indictment charged Oseby with knowingly making false statements of material facts in violation of 18 U.S.C.A. § 1001.  Count two was subsequently dismissed by motion of the United States.

[7]The government asserts that Oseby raises this issue for the first time on appeal. We disagree.  Although Oseby never specifically framed his argument as a violation of his due process rights, he did consistently argue throughout trial that the law as decided by the district court in Hacker was not the law at the time Oseby's was screening property, and thus, should not be applied to his case.  Therefore, we find that this issue is properly before the court.

In Hacker, Judge Piersol thoroughly examined the issue of whether Congress intended to exempt Indian tribes and tribal organizations from compliance with the Act. The defendants asserted that when excess property was donated to a tribe by the BIA, title to the excess property passed to the tribe, and thus, the tribe could dispose of the property without restriction. The district court disagreed with the defendants' interpretation of the Act and the 1988 amendments to the ISDA and held that "Congress intended, through the 1988 amendments to the Indian Self-Determination Act, to lessen the regulatory requirements that Indian tribes and tribal organizations must meet to *obtain* excess federal property for use on Indian self-determination contracts." Hacker, 883 F. Supp. at 448. The court concluded, however, that as a matter of law, Congress did not intend that the tribes receive "authority to *sell* excess federal property by obtaining that property through the GSA screening procedure." Id. Such a grant of authority would have put Indian tribes and tribal organizations at a higher level than federal agencies in regard to the utilization of excess property.

Oseby asserts that, although the district court's determination as to the legality of the Indian tribes selling excess federal property may be considered valid by the court, and the jury instructions given may be considered valid statements of the law, the 1994 decision in Hacker was not foreseeable to Oseby while he operated as a screener for the SWST. Thus, Oseby contends that his due process rights were violated because he did not have fair warning that his conduct was forbidden by the statutes.

Oseby cites Bouie v. City of Columbia, 378 U.S. 347, 350 (1964), where the United States Supreme Court restated the basic principle that "a criminal statute must give fair warning of the conduct that it makes a crime." Failure of a statute to do so violates an individual's due process rights.

> The constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. The underlying

principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.

Id., 378 U.S. at 351 (internal quotation marks and citation omitted). In addition, the Court held that "a deprivation of the right of fair warning can result not only from vague statutory language but also from an unforeseeable and retroactive judicial expansion of narrow and precise statutory language." Id., at 352.

We find Oseby's due process argument to be without merit. Even if Hacker was an unforeseeable judicial enlargement of the statutes, Oseby's due process rights would still not have been violated in view of the district court's instructions to the jury. The conduct that Hacker held is forbidden by the statutes is not the same conduct for which Oseby was convicted. Hacker held that selling excess federal property was prohibited by the Act. Oseby was not indicted for, or convicted of, selling excess federal property.

Oseby was indicted and convicted of conspiracy to make false statements and/or to misapply and convert tribal property.[8] The conspiracy to make false statements charge arose from statements made on the SF 122s by Oseby indicating that the excess property was intended for use in conjunction with the SWST's self-determination contract. The excess property was actually intended for sale to DME. The government indicted Oseby for conspiracy to misapply and convert tribal property because of evidence that Oseby screened excess property on behalf of certain tribal organizations, but did not transfer all of the property to the tribes. For example, there was evidence introduced at trial that showed Oseby screened several graders for the Santa Ana Tribe,

---

[8]The jury was not asked to decide which substantive offense Oseby committed. They were only asked to find whether he conspired to commit an offense against the United States in violation of 18 U.S.C.A. § 371.

the Isleta Pueblo, and for the SWST. The Santa Ana Tribe only received one of the three graders screened on its behalf, and DME sold the other two for a profit.

Both of these activities were clearly forbidden by the statutes before <u>Hacker</u>. Specifically, § 1001 prohibits anyone from knowingly and willfully making a false statement of material fact to a federal agency. In this case, Oseby conspired to make false statements of material facts to GSA, and at the time he contemplated that conduct, he had fair warning that he could be held criminally responsible for his actions. Likewise, §§ 666 and 1163 prohibit someone from misapplying or converting property belonging to an Indian tribe or tribal organization. Oseby was indicted for screening property on behalf of Indian tribe and converting the property to his own use. There can be no question that Oseby was put on fair notice that such conduct was criminal under the statutes at the time of his actions.

Therefore, we find that no constitutional violation occurred in this case. This was not a situation where a law punished as a crime "an act previously committed, which was innocent when done." <u>Davis v. State of Nebraska</u>, 958 F.2d 831, 833 (8th Cir. 1992).

### III. Admissibility of Statements of Co-Conspirator

Under Federal Rule of Evidence 801(d)(2)(E), a statement is not hearsay if it is made "by a coconspirator of a party during the course and in furtherance of the conspiracy." To satisfy the requirements of this exception, the government must prove by a preponderance of the evidence that "(1) a conspiracy existed; (2) that the defendant and declarant were part of the conspiracy; and (3) that the declaration was made during the course and in furtherance of the conspiracy." <u>United States v. Kocher</u>, 948 F.2d 483, 485 (8th Cir. 1991) (internal quotation marks and citation omitted). A district court's determination that the conditions Rule 801(d)(2)(E) have been met is reviewed under the clearly erroneous standard of review. <u>Id.</u>

–11–

At trial, the government offered as evidence against Oseby the memoranda obtained during the search of Raether's residence. The district court received the memoranda into evidence over Oseby's objection after finding that a conspiracy between Oseby, Raether, Hawkins and Hacker existed, and that the statements were made in furtherance of the conspiracy.

On appeal, Oseby contends that there was insufficient evidence to support a finding of a conspiracy. Specifically, Oseby asserts that there was no evidence that he shared a "common goal" with Raether. Oseby also contends that the district court erred when it held the statements were made in furtherance of the conspiracy. We disagree.

"[T]he essential elements of a conspiracy are an agreement with at least one other person with the objective to violate the law, coupled with one or more overt acts in furtherance of the illegal purpose." United States v. Fetlow, 21 F.3d 243, 247 (8th Cir. 1994). "A criminal conspiracy may be inferred from totally circumstantial evidence." Id. Furthermore, "[o]nce a conspiracy is found, only slight evidence linking a defendant to the conspiracy is necessary to convict." Id.

This court has also held that "[t]he identity and exact participation of the other coconspirators in a conspiracy is not required." United States v. Jankowski, 713 F.2d 394, 397 (8th Cir. 1983).

> Secrecy and concealment are essential features of successful conspiracy.
> . . . Hence the law rightly gives room for allowing the conviction of those
> discovered upon showing sufficiently the essential nature of the plan and
> their connections with it, without requiring evidence of knowledge of all
> its details or of the participation of others.

United States v. Kroh, 915 F.2d 326, 334 (8th Cir. 1990) (internal quotation marks and citation omitted).

In addition, in <u>United States v. Rosnow</u>, 977 F.2d 399, 405 (8th Cir. 1992), we stated that "it is not necessary to show that all the conspirators were involved in each transaction or that all the conspirators even knew each other."

> However, for a wheel conspiracy to exist those people who form the wheel's spokes must have been aware of each other and must do something in furtherance of some single, illegal enterprise. Otherwise, the conspiracy lacks the rim of the wheel to enclose the spokes. If there is not some interaction between those conspirators who form the spokes of the wheel as to at least one common illegal object, the wheel is incomplete, and two or more conspiracies rather than one are charged.

<u>Id.</u> (internal quotation marks, citations and brackets omitted). In other words, "a common purpose of a single enterprise must motivate each participant and each act and mere knowledge of another similarly motivated conspiracy or an overlap in personnel do[es] not prove one overall agreement." <u>Id.</u> (internal quotation marks, footnote and citations omitted).

It is undisputed that both Oseby and Raether acted as screeners for the SWST under the direction of its tribal chairman, Hawkins. There was evidence produced that showed Oseby and Hawkins agreed that Oseby would screen property for the SWST and that the SWST would sell the property to DME. Furthermore, the government introduced evidence that Oseby, Hacker and Raether had met, on at least one occasion, to discuss this plan. There was also evidence that Oseby and Raether both attended a meeting in Washington, D.C., in August of 1991, where the legality of selling excess federal property was discussed. In addition, Oseby testified that in early 1992, after he received copies of GSA's memoranda, he talked to Hacker about the implications of GSA's position. Raether's memoranda show that he was also concerned about GSA's position and that he and Hawkins had been communicating about what could be done to circumvent GSA's new policy.

In reviewing the record, we conclude that the district court was not clearly erroneous in finding that a conspiracy existed between Hawkins, Oseby, Raether and Hacker. There was sufficient evidence that all of the conspirators acted with a common purpose of screening excess property for immediate sale by the tribes in order to receive a percentage of the proceeds, and that they conspired to make false statements on the SF 122s and/or misapply tribal property in order to accomplish their goal. We also conclude there was sufficient evidence that the statements in Raether's memoranda were made during the course and in furtherance of the conspiracy. Indeed, the statements reflected Raether's ideas for "getting around" GSA's interpretation of the Act.

Oseby also disputes the district court's ruling on the admission of certain deposition testimony. Hawkins did not testify at Oseby's trial, and thus, a portion of his deposition testimony was read to the jury by Oseby's counsel. The court, under the completeness doctrine, allowed the government to read an additional portion of the deposition into evidence. This additional portion contained a statement by Hawkins that Raether gave him a $10,000 cash "loan" sometime in 1993. Hawkins testified that Raether told him he did not have to pay back the loan and that Raether only pressured him for repayment after the government began investigations against him. Oseby asserts that the statements were prejudicial because in 1993, Oseby was no longer a screener, and he could not have been part of the conspiracy at that time.

Federal Rule of Evidence 106 is commonly referred to as the "Rule of Completeness." It provides that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." The advisory committee notes to Rule 106 state that one of the considerations for this rule is to avoid "the misleading impression created by taking matters out of context."

–14–

The district court overruled Oseby's objection at trial. The court determined that the additional portion of the deposition testimony that the government wanted read to the jury was just a continuation of previous testimony. The standard of review of a district court's evidentiary ruling is abuse of discretion. United States v. J.L.K., Jr., 880 F.2d 993, 995 (8th Cir. 1989). We conclude that the district court did not abuse its discretion when it permitted the government to read the additional portion of Hawkins' testimony.

## IV. Loss under § 2F1.1 of the Sentencing Guidelines

Oseby challenges the district court's calculation under the sentencing guidelines of the amount of loss associated with his fraud. At the sentencing hearing, the district court determined that the loss was $424,432. Accordingly, the base offense level was increased by nine levels. See U.S.S.G. § 2F1.1(b)(1)(J) (1995).[9] The district court

---

[9]Oseby was convicted under 18 U.S.C.A. § 371, which is conspiracy to commit an offense against the United States. Under § 2X1.1, the base offense level for conspiracy is "[t]he base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." U.S.S.G. § 2X.1.1(a). Thus, to determine Oseby's offense level the district court must look to the guideline for the substantive offense. In this case, because the jury did not deliver a guilty verdict as to any specific substantive offense, the district court used § 2F1.1, which is the appropriate guideline for 18 U.S.C.A. § 1001. We note, however, that the appropriate guideline for 18 U.S.C.A. § 666(a)(1)(A) is 2B1.1, or § 2F1.1, and for 18 U.S.C.A. § 1163 it is § 2B1.1. The probation officer and the district court found § 2F1.1, for offenses involving fraud, most applicable to Oseby's offense. Section 2B1.1 is for most forms of property offenses, e.g., theft or embezzlement. It appears, however, that the total offense level would have been the same under either guideline. See U.S.S.G. § 2B1.1.

determined the loss by the gross margin on the sales of excess property by DME from 1991 to 1994.[10]

We review a district court's factual findings of loss under § 2F1.1, using the clearly erroneous standard of review. United States v. Morris, 18 F.3d 562, 570 (8th Cir. 1994). We review a district court's application and construction of the sentencing guidelines *de novo*. United States v. Wells, 127 F.3d 739, 746 (8th Cir. 1997).

In calculating the amount of loss, the district court stated that it was looking at the intended loss to the victim and the actual loss, whichever was greater. With that principle in mind, it set the amount of loss at $424,432. The district court failed to specify, however, whether that amount represented the intended loss or the actual loss, or both.[11] In addition, the court did not make a factual finding as to the time span over which the conspiracy occurred. The district court set the amount of loss at the gross margin for excess property sales from 1991 to 1994, but the court did so without first determining that the conspiracy actually existed over that entire period of time. Furthermore, the court failed to consider whether Oseby was part of the conspiracy for the entire period.

The sentencing guidelines provide that the base offense level and the specific offense characteristics shall be determined on the basis of:

---

[10]Oseby contended that the amount of loss should be set at $55,129. That amount reflected the $424,432, less $297,375 worth of inventory that was seized by the Federal Government and $71,928 in interest expense. The district court found that it was inappropriate to deduct those amounts.

[11]In Wells we held that "the method used by a sentencing court to determine 'loss' depends, in the first instance, on the court's factual findings of the intent of the defendant to cause loss and on the court's factual finding of the extent of actual loss." Id., at 747. The guidelines provide that the loss for sentencing purposes is the greater of the intended loss or the actual loss. See U.S.S.G. § 2F1.1 App. Note 7.

(A)     all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B)     in the case of a jointly undertaken criminal activity . . ., all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense. . . .

U.S.S.G. § 1B1.3(a)(1) (1995).

The Application Note 2 to § 1B1.3 states:

[b]ecause a count may be worded broadly and include the conduct of many participants over a period of time, the scope of the criminal activity jointly undertaken by the defendant ("jointly undertaken criminal activity") is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant. In order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake. . . . The conduct of others that was both in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken by the defendant is relevant conduct under this provision. The conduct of others that was not in furtherance of the criminal activity jointly undertaken by the defendant, or was not reasonably foreseeable in connection with that criminal activity, is not relevant conduct under this provision.

U.S.S.G. § 1B1.3 App. Note 2 (1995).

The guidelines offer several helpful illustrations, one of which is applicable to the present facts:

> Defendants H and I engaged in an ongoing marihuana importation conspiracy in which Defendant J was hired only to help off-load a single shipment. Defendants H, I, and J are included in a single count charging conspiracy to import marihuana. Defendant J is accountable for the entire single shipment of marihuana he helped import under subsection (a)(1)(A) and any acts and omissions in furtherance of the importation of that shipment that were reasonably foreseeable. . . . He is not accountable for prior or subsequent shipments of marihuana imported by Defendants H or I because those acts were not in furtherance of his jointly undertaken criminal activity (the importation of the single shipment of marihuana).

U.S.S.G. § 1B1.3 App. Note 2(c)(3) (1995).

We acknowledge that Oseby was not hired for a single transfer of excess property, and that he was involved in the ongoing conspiracy to make false statements and/or to misapply tribal property. However, there is evidence that he quit screening in November of 1992, and tendered his shares in DME back to the corporation in May of 1993. We have held that a person cannot be held liable for the losses caused by other conspirators in the scheme prior to the time the person entered the conspiracy. See United States v. Cain, 134 F.3d 1345, 1349 (8th Cir. 1998). It seems logical that a person should also not be held responsible for the losses that occur after he exits the conspiracy. This is especially true in a case where that person is a minor participant in the conspiracy, as the district court found Oseby was in this conspiracy.

In addition, after a careful review of the record, we question whether there was "jointly undertaken criminal activity" prior to GSA issuing its memorandum in January of 1992. While there is no doubt that Oseby and Raether were screening property in 1991 for the SWST, and DME was buying it for immediate sale, Oseby was not charged with conspiracy to sell excess federal property. It wasn't until January of 1992,

–18–

that Oseby and the others began to conspire to make false statements on the SF 122s in order to avoid GSA's new policy on transferring excess federal property. Indeed, prior to GSA's memorandum in January of 1992, there was no reason to conspire to make false statements because GSA was approving all of the transfers of excess property to the tribes without questioning the tribes' intentions. In addition, the incidents that gave rise to the charge for conspiracy to misapply tribal property did not occur until late 1991, or early 1992.

Therefore, we conclude that the case should be remanded for the purpose of allowing the district court to make factual findings as to when the conspiracy began. In addition, the case is remanded for the district court to make factual findings as to whether Oseby had jointly undertaken any criminal activity after November 30, 1992. Once the district court makes such factual determinations, it should clearly state its method for calculating loss, and determine loss by the greater of the intended loss or the actual loss.

Oseby contends that since he was only a 24.5% shareholder in DME, however, it was unfair of the district court to attribute all of DME's profits from the sale of the excess federal property to him. The fact that Oseby did not personally reap 100% of the profits from the sale of the excess property is not relevant in calculating either the intended loss or actual loss.

Oseby also contends that the amount of loss should have been decreased by the amount of DME's interest expense for the relevant time period. When the district court calculated the loss, it properly took into account DME's expenses in repairing the excess property, as both parties concede much of the equipment was in poor condition at the time it was screened and needed repairing before it could be sold. DME's interest expense, however, does not reduce the amount of loss.

We also reject Oseby's argument that he never intended to harm the SWST. There was evidence at trial that the SWST was not aware that DME was selling the excess equipment at such an increased price over the price it paid the SWST. As stated above, Oseby testified that DME only paid the SWST approximately10% of the proceeds from the sale of the excess equipment. In addition, there was evidence that Oseby, on at least one occasion, screened property on behalf of the Santa Ana Tribe but converted the property to his own use.

## V. Conclusion

In summary, we affirm Oseby's conviction, but vacate his sentence. We remand to the district court for further factual findings in accordance with this opinion, and for re-sentencing based on such factual determinations.

A true copy.

ATTEST:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.